**Daniel NOLAN**

v.

**Palmer C. SCAFATI.**

**Civ. A. No. 69–1256.**

United States District Court
D. Massachusetts.

Dec. 2, 1969.

---

## OPINION

WYZANSKI, Chief Judge.

This Court received November 29, 1969 from Daniel Nolan, his letter dated November 22. The letter asks that it be treated as a complaint filed against Palmer C. Scafati, Superintendent of the Massachusetts Correctional Institution, Walpole, seeking relief under 42 U.S.C. Sec. 1983, and presumably invoking this Court's jurisdiction under 28 U.S.C. Sec. 1343. (See page 12, line 5, and page 11, last four lines.)

The following paragraph summarizes the allegations of the letter. Nolan is now a prisoner in Walpole serving a sentence imposed by a court of the Commonwealth of Massachusetts. A Walpole guard charged Nolan, while in prison, with threatening the warden and causing a disturbance. On that charge, Nolan was brought before a Walpole prison disciplinary committee, which had ostensible authority to order that he be placed in solitary confinement. Each day's solitary confinement is itself a punishment and also operates to reduce a prisoner's good conduct credit by three days. The good conduct credit is established by a Massachusetts statute, and is determinative of the prisoner's release date, and affects his parole. The procedure customarily adopted by the disciplinary committee is to receive a written report from the guard or other person complaining of a prisoner's supposed misconduct. The committee then hears the prisoner in person. The prisoner does not have the right to counsel, nor the right to cross-examine the complaining guard, nor the right to call his own witnesses. When he was charged and brought before the committee, Nolan seasonably asked to have those three alleged rights, on the ground that he regarded each right as guaranteed to him by the due process clause of the Fourteenth Amendment to the United States Constitution. The committee denied Nolan's claims to those supposed rights. But (it may fairly be inferred from Nolan's letter) the committee informed Nolan of the contents of the guard's report, identified the author of the report, and gave Nolan ample opportunity to state his version of the events in question. Thereafter, the committee found that Nolan was guilty of the conduct charged by the guard, and ordered him to solitary confinement, where Nolan now is.

No doubt, a prisoner does have rights under the United States Constitution, and if a state prison superintendent, under color of any State statute, ordinance, regulation, custom or usage, subjects, or causes to be subjected, a prisoner to the deprivation of any rights, privileges, or immunities secured by the United States Constitution, the superintendent is liable to the injured prisoner, 42 U.S.C. Sec. 1983. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030; Brown v. Brown, 368 F.2d 992, 993, 9th Cir.; Howard v. Smyth, 365 F.2d 428, 4th Cir.

But that truism leaves unsettled the question as to whether, under the United States Constitution, a state prisoner has the right to counsel, to cross-examination, and to summon witnesses at a prison hearing which may result in his being isolated in solitary confinement or in a postponement of his release date, the delay being attributed either to want of good conduct credits or to a poor prison record considered by the parole authorities.

So far as this Court knows, this issue has not been adjudicated heretofore.

Of course, the general rule is that under ordinary circumstances prison authorities have a large discre-

tion as to matters of prison administration and that, therefore, neither under 42 U.S.C. Sec. 1983 nor otherwise, will a federal court grant relief to a state prisoner complaining against his state warden because of the latter's disciplinary orders. Douglas v. Sigler, 386 F.2d 684, 688, 8th Cir.; Cooper v. Pate, 382 F.2d 518, 523–524, 7th Cir.; Negrich v. Hohn, 379 F.2d 213, 215, 3rd Cir. But there are exceptional cases, as when a substantive constitutional right is involved. Examples are unconstitutional denials of religious liberty. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L. Ed.2d 1030; Howard v. Smyth, 365 F. 2d 428, 4th Cir.

Here, however, the state prisoner seeks vindication of what he regards as his procedural, not his substantive, rights. Procedural rights vary according to the forum which is using the procedure, the relationship of that forum's tribunal and the claimant, and the entire context in which the proceedings are conducted. As Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 teaches:

> " * * * as a generalization, it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding are all considerations which must be taken into account."

See Charles Alan Wright, The Constitution and The Campus, 22 Vanderbilt Law Review 1027, at pp. 1060, 1070, 1071–1076.

A prison authority is primarily executive. It allocates prisoners in the interests of safety, good order, and efficient administration as well as of fairness. Its social purposes require emphasis on security and discipline.

A prisoner is one whose freedom has been intentionally restricted in the interests of the safety of society, his own reform, and a deterrence of misconduct by him or others. While he is not sent to prison for punishment, he has been sent there as punishment. It is not appropriate that he have all the liberties of a free man. Only such liberties are rightfully his as are indispensable to fair and decent treatment, to avoidance of cruel and unusual punishment, and to preclusion of invidious discrimination. In the ordinary situation he is to be held to toe the mark, and not to call others to account. Only where those who exercise authority over him have acted arbitrarily, without any plausible relation to considerations of fairness, or security, or legitimate order, or rational discipline, has he a constitutional right to have their authority subjected to judicial control.

Without deciding the matter, we may for present purposes assume that the due process clause requires, as a matter of fairness, that before a prison authority imposes upon a prisoner a serious penalty (as distinguished from a summary action to quell a disturbance, or a protective order against immediate risks) the authority must (1) advise the prisoner of the charge of misconduct, (2) inform the prisoner of the nature of the evidence against him, (3) afford the prisoner an opportunity to be heard in his own defense, and (4) reach its determination upon the basis of substantial evidence.

Nolan's letter in the case at bar does not indicate that the Walpole authorities failed to meet any of those four standards.

What Nolan chiefly urges is that he had a right to have a lawyer present. It is to be borne in mind that neither the superintendent, nor the committee, nor any guard had a lawyer. Lawyers are not customarily involved in prison disciplinary matters. Indeed it appears that the prevailing view (sound or not) is that even in the free life of universi-

ties, students faced with disciplinary charges have no constitutional right to be represented by counsel. Wasson v. Trowbridge, 382 F.2d 807, 812, 2nd Cir. But see the persuasive criticism in Charles Alan Wright, The Constitution on The Campus, 22 Vanderbilt L.Rev. 1027, 1075–1076. Whatever may be the rights of persons who have the full freedoms of civic life, those who have been placed under the control of a prison authority are not entitled to the full panoply of a trial, before disciplinary steps are taken. When society places a man in prison it has a most important interest in preserving the executive authority of the prison superintendent. While the warden is not to be an arbitrary autocrat, he has no need to listen to quibbles and quiddities before he exercises his commanding authority to secure both the outside community and the prison community from danger, reasonably apprehended.

■ In short, a prisoner does not have a constitutional right to a lawyer when the prisoner appears before an internal disciplinary committee of the prison.

Nor does the prisoner have a constitutional right to cross-examine those who have given statements against him. Cross-examination of a superintendent, a guard, or a fellow prisoner would almost inevitably go beyond the usual consequences of such probing in a court. It would tend to place the prisoner on a level with the prison official. Such equality is not appropriate in prison. And it is hardly likely that in the prison atmosphere discipline could be effectively maintained after an official has been cross-examined by a prisoner. There are types of authority which do not have as their sole or even principal constituent, rationality. Parents, teachers, army commanders, and above all, prison wardens have the right to depend to a large extent (though not arbitrarily) upon habit, custom, intuition, common sense not reduced to express principles, and other forms of judgment based more on experience than on logic.

Life requires in some aspects another sovereign than reason. To rule is not to opine.

Similar considerations lead to the conclusion that a prisoner does not have a constitutional right to call witnesses. A judicial examination of one's fellow prisoners in an atmosphere of a prison might easily prejudice discipline, security, and "degree, priority, and place". Troilus and Cressida, I, iii, 86.

Despite the fact that this Court concludes that Nolan's constitutional rights have not been violated, this opinion should not be construed as indicating what is the best prison practice, nor should it be supposed that a prison authority is free to disregard the four elements of fairness which at an earlier stage were assumed to be essential parts of the due process to which a prisoner is entitled.

Complaint dismissed.