**Michael A. MEOLA, Plaintiff,**

v.

**John J. FITZPATRICK et al., Defendants.**

**Civ. A. No. 70–833–G.**

United States District Court,
D. Massachusetts.

Feb. 8, 1971.

Michael A. Meola, pro se.

Robert A. Bell, Center for Criminal Justice, Boston, Mass.

Mark Berson, Asst. Atty. Gen., for defendants.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

This action is brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, to enjoin the defendants from interfering with plaintiff's access to the courts. The court has jurisdiction under 28 U.S.C. § 1343(3). The plaintiff, Michael A. Meola, was at the time of the filing of the complaint an inmate of the Massachusetts Correctional Institution located at Walpole, Massachusetts (hereinafter referred to as Walpole). He is presently confined at Bridgewater State Hospital, a facility under the Depart-

ment of Correction, for observation as to his sanity pursuant to Mass.G.L. c. 123, § 103. The defendants are John J. Fitzpatrick, Commissioner of Corrections of the Commonwealth of Massachusetts, and Robert Moore, Superintendent of Walpole. After an evidentiary hearing at which plaintiff was represented by court-appointed counsel the court makes the following findings of fact and conclusions of law.

## Findings of Fact

1. On June 10, 1965 plaintiff was sentenced to Walpole for a term of 5 to 10 years by the Superior Court of Essex County after pleading guilty to the crime of sodomy. Since his confinement at Walpole in 1965, plaintiff has been charged on numerous occasions with violating institution rules and regulations. These violations have resulted in numerous disciplinary proceedings against the plaintiff by the defendants at Walpole. Disciplinary action by the defendants at Walpole against the plaintiff as the result of these violations has taken the form of loss of privileges, transfers to segregation areas, and loss of good time. Plaintiff has been and is presently considered a serious disciplinary problem by the defendants at Walpole.

2. The procedure for transmittal of petitions for habeas corpus, other postconviction remedies and other legal papers of prisoners to state and federal courts by Walpole authorities is as follows: The prisoner encloses the communication to the court (hereinafter referred to generically as a petition) in an unsealed envelope and personally places it or has it placed into a mailbox at the institution. All petitions by prisoners to state or federal courts are reviewed by the institution mail censor, who usually forwards them to the court forthwith. No record is kept of such petitions. The mail censor may question the propriety of sending a prisoner's petition to the courts, in which event he refers it to the superintendent for review.

3. After reviewing a questioned petition, the superintendent may forward it to the courts "as is", in which event his secretary records the date when forwarded, the inmate's name, the type of petition, and to what court it is sent. Or the superintendent may return the petition to the prisoner. He will do so if the petition contains improper language or if there are multiple petitioners and not all of them have signed the petition. The reason for this latter practice is to insure that the consent of all co-petitioners named as parties to an action has been obtained. These are the only grounds for the superintendent's returning a petition to an inmate.

4. On April 16, 1967 former Superintendent Palmer C. Scafati returned to plaintiff a petition for a writ of mandamus[1] addressed to the Superior Court of Norfolk County. This petition charged John A. Gavin, Commissioner of Corrections, Scafati and Francis Weaver, School Principal, with cruel and unusual punishment and denial of educational materials. It called the respondents "liars and dissembers" [sic], who would "dupe the court, or veil the truth." Four days later a watered-down version of the same petition was posted by the plaintiff and forwarded to the court after review by the Superintendent.

5. In March 1968 an explosive device blew up in the cell of an inmate named Lewis. The superintendent and his deputy believed that plaintiff was responsible and transferred him on March 28 to the "new man's section" of the prison for segregation and kept him there for approximately two months. Plaintiff was not given an opportunity to refute the authorities' suspicions and was never brought before a disciplinary board with respect to the incident. No one was charged with responsibility. Plaintiff's release from segregation and return to the general population at the end of May came on the day after he mailed

1. The court received in evidence copies of all relevant petitions referred to in these findings of fact.

an application for a writ of mandamus against the authorities for placing him in segregation solely on the basis of suspicion. There is no record that this application was forwarded into court by the Walpole authorities.

6. On January 5, 1969 plaintiff was transferred to block #9, the principal segregation unit at the prison, for creating a major disturbance. Plaintiff remained there until his transfer to the departmental segregation unit, Bridgewater (hereinafter referred to as D.S.U.) on February 17, 1969. On January 24, 1969 plaintiff was reported for breaking up his room in block #9. Action with respect to this incident was not taken by the disciplinary board until March 2, 1969, after petitioner had been transferred to the D.S.U. This action resulted in petitioner's loss of 60 days' good time.[2]

7. During January and February, 1969, while in block #9, plaintiff sent two petitions to the Superior Court for Norfolk County, one claiming a denial of educational materials and the other claiming cruel and unusual treatment. On February 11 plaintiff drafted and posted a petition claiming denial of medical treatment to himself and certain other inmates confined in block #9. On February 16, 1969 Assistant Deputy John Bates, on instructions from the superintendent, informed the plaintiff that his petition would not be forwarded to the court because there were too many names on it and the superintendent did not know if all co-petitioners had consented to be named as parties. Later on the same day plaintiff drafted and posted a habeas corpus petition addressed to the United States District Court at Boston, in which he was the only plaintiff, alleging that the defendants had thrice denied him access to state courts. The next morning, Deputy Butterworth visited the plaintiff in block #9 and had with him the petition plaintiff had addressed to the federal court on the day before. Butterworth warned plaintiff against sending out any more such petitions and tore into pieces the one he had with him.

8. On the afternoon of February 17 plaintiff was transferred to the D.S.U. at Bridgewater. Plaintiff was given no notice of this transfer. Superintendent Scafati had written to the Commissioner of Corrections on February 14 requesting the transfer. The primary reason given for the request was plaintiff's involvement as a "racial agitator" at Walpole. However, no evidence in plaintiff's personnel folder at Walpole supported the allegation that plaintiff was a racial agitator and testimony in this court indicated that he was not. The primary reason for plaintiff's transfer to D.S.U. was his persistent and irritating attempts to bring his grievances against the defendants to the attention of the courts. The plaintiff lost the opportunity to earn approximately 30 days of "good time" as a result of this transfer. He was returned from D.S.U. to Walpole on April 29, 1969.

9. Upon his return to Walpole from D.S.U. plaintiff was confined in block #9 for reasons which did not appear in the evidence. On June 19, 1969 plaintiff posted a habeas corpus petition against the prison authorities addressed to the Superior Court for Norfolk County, claiming cruel and unusual punishment. Shortly thereafter he was visited by Superintendent Scafati, who had the petition with him and who told him that if he persisted in filing court petitions he would be transferred out of state. There is no record that the petition was

2. Under Mass.G.L. c. 127, § 129, every prisoner "whose record of conduct shows that he has faithfully observed all the rules of his place of confinement, and has not been subjected to punishment, shall be entitled to have the term of his imprisonment reduced by a deduction" from his sentence. The amount of this deduction is dependent upon the length of the prisoner's sentence. For example, if a prisoner has been sentenced to four years or more, as was the plaintiff, the goodtime deduction is twelve and one-half days for each month. If a prisoner violates any rule of his place of confinement, a portion of his accumulated good time is subject to forfeiture.

forwarded into the court by the Walpole authorities.

10. Mass. G.L. c. 123A, § 6, provides in part that a superintendent of a prison may initiate proceedings for commitment of an inmate to the Treatment Center for Sexually Dangerous Persons (hereinafter referred to as the Treatment Center) if it appears to him that an inmate is sexually dangerous.[3] At Walpole, an advisory screening board (hereinafter the Board) is responsible for the classification of inmates first entering the institution. Among the further duties delegated to it by the superintendent is the making of the initial determination as to whether to bring c. 123A proceedings against a particular inmate.[4] The key member of the Board is the director of treatment, who since January 1966 has been Dr. Stanley Kruger.

11. The Board's preliminary step in initiating a c. 123A proceeding is requesting a psychiatrist on the staff of the Division of Legal Medicine of the Department of Mental Health to examine the inmate in question and to determine whether he may be, in the opinion of the psychiatrist, a sexually dangerous person and whether further observation at the Treatment Center is recommended. The policy of the Board is to request routinely such an examination of any inmate committed to Walpole for a crime of a sexual nature. If the psychiatrist recommends further observation, the Board submits its recommendation and the psychiatrist's report to the superintendent. The superintendent, upon receipt of these papers, files a c. 123A motion in the Superior Court requesting that the prisoner be committed by the court to the treatment center for a sixty-day observation period. The policy of the superintendent is to file motions to commit soon after receipt of the recommendation of the Board.

12. On July 9, 1965 the Board at Walpole requested a c. 123A psychiatric examination of the plaintiff. On September 9 Dr. Newman Cohen examined him and on October 7, notified the Walpole authorities that he might be a sexually dangerous person and recommended plaintiff's commitment to the Treatment Center for a sixty-day observation period. However, more than two and one-half years elapsed before Superintendent Scafati filed a c. 123A motion to commit him. On November 12, 1965 plaintiff was transferred to Massachusetts Correctional Institution at Concord (hereinafter referred to as Concord) fol-

3. Chapter 123A, § 6, provides: "If a prisoner under sentence in any jail, house of correction or prison, or in the custody of the department of youth services, appears to the sheriff, keeper, master, superintendent or commissioner of youth services who has him in custody or to the district attorney for the district in which such prisoner was sentenced to be a sexually dangerous person and in need of the care and treatment provided at the center, such officer may notify the commissioner of mental health, who shall thereupon cause such prisoner to be examined by a psychiatrist at the institution wherein he is confined. Such psychiatrist shall report the results of his examination in writing to the sheriff, keeper, master or superintendent, commissioner of youth services, or district attorney, and if such report indicates that such person may be a sexually dangerous person, the sheriff, keeper, master or superintendent, commissioner of youth services, or district attorney shall thereupon transmit the report to the clerk of the courts for the county wherein such prisoner was sentenced, and if such prisoner was sentenced in Suffolk county, to the clerk of the superior court for the transaction of criminal business, together with a motion to commit such person to the center or a suitable branch thereof for examination and diagnosis for a period not exceeding sixty days. The court shall act upon such motion speedily, and if it grants the motion, shall commit such person under the provisions of section four in so far as may be applicable."

4. In the classification of entering inmates, the Board functions as a committee of from two to eight persons. However, with respect to the processing of prisoners for c. 123A clearance or commitments, the Board is as a practical matter a committee of one, i. e., the director of treatment, now Dr. Kruger.

lowing a riot at Walpole and was not returned to Walpole until March 15, 1966. Meanwhile in January 1966, Dr. Kruger became director of treatment at Walpole; and his predecessor never brought Dr. Cohen's recommendation regarding plaintiff to his attention.

13. The Board has no procedure for a continuous review of an inmate's c. 123A status. Delays will be called to the Board's attention only at the time an inmate becomes eligible for parole. The policy of the Parole Board is that parole will not be granted to an inmate eligible for parole until after any question as to his being a sexually dangerous person has been resolved in his favor either by a psychiatrist or a court. Thus, it is the practice of the institutional parole officer to keep a record of any c. 123A action pending against an inmate whose psychiatric examination has been requested by the Board and to ask the Board about such an inmate's c. 123A status immediately prior to an upcoming parole hearing. Only upon the receipt of such an inquiry will the Board ordinarily learn of a delay in bringing a c. 123A proceeding to court.

14. On May 23, 1967 plaintiff was denied parole because of his infractions while in prison. On April 9, 1968 the Board requested that new c. 123A proceedings be initiated with respect to the plaintiff. On April 13, 1968 Dr. Daniel M. Weiss examined the plaintiff and by letter dated April 23 recommended his commitment to the Treatment Center for a period of observation not exceeding 60 days. On May 14 Superintendent Scafati filed a motion to commit plaintiff pursuant to c. 123A in the Superior Court of Essex County. On May 21 the Parole Board voted "no action" on plaintiff's case since plaintiff was at that time "in isolation."

15. In June 1968 Superintendent Scafati's motion for commitment under c. 123A was called for a hearing in Superior Court and a public defender was appointed to the plaintiff. Various delays ensued. These delays were at the instance of the defense counsel who was having difficulty securing the services of a defense psychiatrist and was awaiting a pending Supreme Judicial Court determination of the constitutionality of c. 123A. On May 14, 1970 the court dismissed the c. 123A proceedings on the ground that Dr. Weiss's examination of April 1968 could not properly serve as a basis for a commitment more than two years later.

16. On May 15, 1970 the district attorney's office in Essex County informed defendant Superintendent Robert J. Moore of Walpole that plaintiff's case had been dismissed and requested that a new c. 123A proceeding be initiated. So on the same day the Board started the c. 123A procedure all over again and for the third time recommended a psychiatric examination of the plaintiff. On May 28 plaintiff was denied parole because of the pendency of the Board's recommendation. On June 10 Dr. Weiss attempted to interview the plaintiff, who refused to talk to him. By letter dated July 9 Dr. Weiss recommended that plaintiff be committed to the Treatment Center for observation not exceeding 60 days. On July 23 Superintendent Moore filed a motion to commit. On July 29 the Superior Court appointed counsel to represent plaintiff and, after a hearing, committed him to the Treatment Center for 60 days' observation. At the Treatment Center, where plaintiff was confined until September 27, 1970, plaintiff refused to submit to psychiatric examinations and was involved in a serious assault on another inmate.

17. On September 27 plaintiff completed the sixty-day observation period and was returned to Walpole. On September 30 he was committed to Bridgewater State Hospital for 35 days' observation for the purpose of determining his sanity pursuant to Mass.G.L. c. 123, § 103,[5] by the District Court of Western

5. Chapter 123, § 103, provides: "The superior court upon a report under the preceding section, if it considers the prisoner to be insane or in such mental condition that his commitment to an institution for the insane is necessary for his proper

Norfolk. The basis for this commitment was the assault on the other inmate while plaintiff was at the Treatment Center. Plaintiff is presently confined at the State Hospital under a second c. 123, § 103 commitment.

18. While confined for the past five and a half years plaintiff has not been involved in any abnormal sexual activities.

19. Plaintiff's scheduled release date from his Walpole sentence is November 5, 1971. This date takes into account plaintiff's forfeiture of 276 days' good time as punishment for approximately 35 disciplinary violations.[6]

As this case unfolded at the hearings and through the exhibits and other filings of the parties, two issues connected with plaintiff's basic claim of denial of access to courts became manifest and have been briefed and argued by the parties, namely, procedural due process at prison disciplinary hearings and a disciplinary transfer to D.S.U. and punitive use of the c. 123A procedure by defendant prison officials. The court will consider and rule upon these ancillary issues as well as on plaintiff's primary claim.

### Prisoners' Access to Courts

■ A prisoner has a constitutional right of access to the courts under the First Amendment. This principle was recognized in Ex Parte Hull, 1941, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034, recently discussed in Nolan v. Scafati, 1 Cir., 1970, 430 F.2d 548. To the prison inmate, the right of access to the courts is a precious one, for "its administrative-

ly unfettered exercise may be of incalculable importance in the protection of rights even more precious." Coleman v. Peyton, 4 Cir., 1966, 362 F.2d 905, 907. As a corollary to these principles, punishment inflicted on a prisoner for the exercise or attempted exercise of his right of access to the courts is patently invalid. As stated in Carothers v. Follette, S.D.N.Y., 1970, 314 F.Supp. 1014, 1022, "imposition of punishment or threat of such punishment based upon a prisoner's statements or complaints to the court about prison conditions chills the prisoner's exercise of his First Amendment right to voice legitimate complaints, and thus would amount to a form of deterrent censorship."

In the instant case the court finds that on at least four occasions, April 16, 1967, late May 1968, February 17, 1969 and June 19, 1969, the defendants at Walpole effectively denied the plaintiff his constitutional right of access to the courts. The court also concludes that defendants, in transferring plaintiff to D.S.U. on February 17, 1969, were motivated chiefly by a desire to punish him for the exercise and attempted exercise of his right of access to the courts and that such a transfer without notice or a hearing was unlawful.

■ At the hearing former Superintendent Scafati testified as to the general procedure for screening petitions to the court. In brief, Walpole officials review all petitions and forward some of them to the superintendent, who returns petitions to the prisoner if (1) there are co-petitioners and it is not clear that all co-petitioners have consented or (2) the language is "improper."[7] This practice

---

care or observation pending the determination of his insanity, and his removal expedient, shall issue a warrant, directed to the warden or superintendent, authorizing him to cause the prisoner, if a male, to be removed to the Bridgewater state hospital, and, if a female, to be removed to one of the state hospitals for the insane, subject to the provisions of section one hundred and five."

6. This approximation includes five violations recorded while plaintiff was in Concord in the winter of 1965–1966.

7. At the hearing Superintendent Scafati testified that this basis of "censorship" was only implemented where obscene language was used. However, an examination of the exhibits, especially a copy of plaintiff's April 16, 1967 petition, indicates that the Walpole authorities considered obscenity to include language which was critical of them.

inevitably involves screening the contents of prisoners' communications to the courts.

Censorship of the content of prisoners' petitions to the courts violates the First Amendment. At the hearing, no justification for such a practice was given; and none is apparent except the trivial one of protecting the sensibilities of court officials.[8] There is no valid prison interest in screening and controlling the content of court papers sufficiently compelling so as to limit a prisoner's constitutional right to free and unfettered access to the courts. Cf. Palmigiano v. Travisono, D.R.I., 1970, 317 F.Supp. 776. The fact that prisoners may exaggerate about prison conditions and make false allegations against prison officials cannot justify prison review and censorship of the contents of an inmate's correspondence with the courts. See Carothers v. Follette, S.D.N.Y., 1970, 314 F.Supp. 1014, 1022.

### Due Process in Prison

In Nolan v. Scafati, *supra*, 430 F.2d at 550, the court discussed the question of whether due process safeguards were required for the meting out of prison disciplinary penalties, stating that an issue was "whether the punishment here proposed or inflicted was sufficiently great to require procedural safeguards, and if it was, whether sufficient safeguards were provided. While all the procedural safeguards provided citizens charged with a crime obviously cannot and need not be provided to prison inmates charged with a violation of prison discipline, some assurances of elemental fairness are essential when substantial individual interests are at stake." See also the opinion of the District Judge in the same case, 306 F. Supp. 1, 3–4.

Two recent cases in the Southern District of New York, Sostre v. Rockefeller, S.D.N.Y., 1970, 312 F.Supp. 863, and Carothers v. Follette, *supra*, have required procedural due process in the imposition of prison punishment. The court in *Sostre* held that a "sentence" to more than a year in punitive segregation (actually solitary confinement) without minimal procedural safeguards was unlawful. However, the court broadened its ruling to include all charges for which a prisoner may suffer a loss of good time. "A prisoner carries with him to prison his right to procedural due process which applies to charges for which he may receive punitive segregation or any other punishment for which earned good time credit may be revoked or the opportunity to earn good time credit is denied." Sostre v. Rockefeller, 312 F.Supp. at 872. In Carothers v. Follette, *supra*, the court held that procedural due process was required where the prisoner suffered 4½ months in solitary confinement, loss of the opportunity to earn 46 days good time while in such confinement and loss of 60 days accumulated good time, stating at 1028 of 314 F.Supp.,

> "[W]e cannot accept defendants' contention that the essential elements of fundamental procedural fairness— advance notice of any serious charge and an opportunity to present evidence before a relatively objective tribunal—must be dispensed with entirely because of the need for summary action or because the administrative problems would be too burdensome. Although a prisoner does not possess all of the rights of an ordinary citizen he is still entitled to procedural due process commensurate with the practical problems faced in prison life."

8. The superintendent at Walpole sends the following notice along with prisoners' correspondence forwarded to the courts: "The decision to allow an inmate to write to a Judge or a Public Official is one that causes concern to the Administration of a penal institution. On the one hand the Judge or Public Official may well be disturbed by the attitude of the sender or by the contents of the letter; on the other hand, to deny an inmate this privilege may impede justice. The censorship stamp should not be construed as meaning the contents of the missive are factual."

In Massachusetts too, where earned good time credit entitles an inmate to an earlier release date,[9] revocation of good time has some of the characteristics of extending a sentence. Similarly, if a prisoner loses the opportunity by virtue of segregation or isolation to earn good time credits, his effective term of imprisonment is thereby increased.

In the instant case, the court is not called upon to delineate the precise boundaries of prison due process with respect to disciplinary action, but to weigh the severity of the punishment imposed by defendants against the extent of procedural due process, i. e., "elemental fairness" afforded to the plaintiff. The punishments were (a) segregation in the "new man's section" of the prison for approximately 60 days in April and May 1968 on suspicion of placing an explosive in another inmate's cell, (b) loss of 60 days earned good time imposed on March 2, 1969 on a charge of destruction of furnishings in his room in block #9 and (c) transfer to D.S.U. for a period of approximately ten weeks in 1969 on a principal allegation of racial agitation. As to punishments (a) and (c), no hearing of any kind was held. As to punishment (b), a hearing in the sense of a report being received from a corrections officer was held at Walpole, but plaintiff was at D. S.U. in Bridgewater at the time and had no notice of nor opportunity to respond to the charge.[10]

The punishments imposed on the plaintiff were substantial, resulting either in loss of earned good time or inability to earn good time for periods of approximately 60 days or longer. Therefore, in the court's opinion, they were "sufficiently great to require procedural safeguards", Nolan v. Scafati, *supra*, 430 F.2d at 550, at least the elementary ones of notice of the charges against him and an opportunity to reply to them. Having been imposed without such safeguards, they were unlawful and violative of the provisions of the Fourteenth Amendment of the United States Constitution.

### Chapter 123A Proceedings

Plaintiff's claim concerning the defendants' use of c. 123A proceedings against him is couched in terms of arbitrary and capricious state action in violation of the due process clause. However, the gravamen of his complaint with respect to this aspect of the case is that defendants at Walpole initiated a series of c. 123A proceedings against him for punitive purposes, i. e., to punish him for his multifarious disciplinary violations and for filing and attempting to file petitions to various courts.

At the outset, we note that Mass.G.L. c. 123A is a comprehensive treatment program for those deemed by the courts to be "sexually dangerous persons." Two procedures are set forth for the day-to-life commitment of such persons to the Treatment Center at Massachusetts Correctional Institution, Bridgewater; one, (§§ 4 and 5) relates to sentencing of defendants convicted of sex-related crimes, and the other (§ 6) to prisoners convicted of any crime who appear to their custodians to be sexually dangerous. In Commonwealth v. Major, 1968, 354 Mass. 666, 241 N.E.2d 822, the § 6 procedure was challenged as an unreasonable classification under the equal protection clause. The court upheld the constitutionality of this section since it deemed the classification of prisoners reasonable in view of the extensive opportunity for observation of an inmate afforded prison officials by virtue of their continuous custody over him. See

9. See Mass.G.L. c. 127, § 129; Gildea v. Com'r., 1957, 336 Mass. 48, 49, 142 N.E. 2d 400; Lembersky v. Parole Board, 1955, 332 Mass. 290, 294, 124 N.E.2d 521, and Greenfield v. Scafati, D.Mass., 1967, 277 F.Supp. 644, aff'd 1968, 390 U.S. 713, 88 S.Ct. 1409, 20 L.Ed.2d 250.

10. In this court plaintiff testified that he had no connection with the explosion in the other inmate's cell and that he was not a racial agitator, and called a corroborating witness on the latter point; and offered a justification for damaging his cell.

also Peterson v. Gaughan, D.Mass., 1968, 285 F.Supp. 377, aff'd 1 Cir., 1968, 404 F.2d 1375. On the other hand, evidence of sexual misconduct while imprisoned is not in every case a prerequisite to commitment under § 6. Commonwealth v. Gomes, 355 Mass. 479, 245 N.E.2d 429.

 It is well established that proceedings under c. 123A are nonpenal. "There may be no punitive aspects to such confinement." Commonwealth v. Gomes, supra, at 484, 245 N.E.2d at 432. It follows that resort to c. 123A as a punitive instrument, as alleged here, would be punishment both cruel and unusual in violation of the Eighth and Fourteenth Amendments.[11]

 Plaintiff's claim that pending c. 123A proceedings were instituted to punish him must be viewed against the background of his having been punished three times previously without due process of law and having been repeatedly denied access to the courts. This claim of plaintiff rests primarily upon two additional circumstances: first, the pending proceedings were instituted toward the end of his term of imprisonment, approximately five years after his incarceration; and second, plaintiff did not engage in any sexual misconduct while in prison.

It seems apparent that if a man is mentally ill upon entering prison, i. e., if he is a sexually dangerous person, and if an effective treatment center with strict security is available, he should be committed to the treatment facility immediately. Prison officials should not wait until their custody over such an inmate is near an end before initiating proceedings aimed at a possible lifetime commitment. The Treatment Center at Bridgewater is by no means simply a

place for the segregation and confinement of sexually dangerous persons, but rather one where they receive continuous rehabilitative treatment by a professional staff of psychiatrists, psychologists and social workers. Security there is strict.[12]

Under the special circumstances of this case, therefore, we believe that the burden is properly placed on the defendants to explain why the c. 123A proceedings against plaintiff were not punitive and to justify the delay in bringing the pending proceedings against him in May, 1970.[13]

In the instant case, defendants have sustained this burden of proof. They proved that the policy of the Advisory Screening Board is to request routinely a psychiatric examination of an inmate, like plaintiff, sentenced to Walpole for a crime of a sexual nature, and that such an examination was requested for the plaintiff in July 1965, one month after his arrival at Walpole. Although the examiner recommended the initiation of commitment proceedings, they were not commenced because of the concurrence of two events: plaintiff's disciplinary transfer to Concord and a succession in the position of director of treatment. When the new director, Dr. Kruger, learned by chance in April 1968 that a c. 123A motion to commit the plaintiff for observation had not been filed, he requested another preliminary psychiatric examination and a motion to commit was filed pursuant to § 6 on May 14, 1968. After numerous postponements requested by plaintiff's counsel, these proceedings were dismissed in May 1970 on the grounds of staleness of the April 1968 preliminary psychiatric examination. The present c. 123A proceedings against plaintiff were then initiated at

11. See Tingler, Unconstitutional Punishment, 6 Crim.L.Bull. 311, 322–324 (1970), for a discussion of the application of the Eighth Amendment to civil sanctions.

12. Although not part of the record in this case, the court understands that there has never been an escape from the Treatment

Center since the inmates were moved into their present quarters eight years ago.

13. We need not decide whether the same burden should be placed on the prison administration in every case where long delay coincides with a lack of any indication of sexual misconduct while in prison.

the request of the Essex County District Attorney, since no determination on the merits of petitioner's sexual dangerousness *vel non* had been made by the superior court. Although the evidence may indicate institutional negligence, it rebuts any presumption that the c. 123A proceedings were used punitively in violation of the Eighth and Fourteenth Amendments.

### Order

Therefore it is ordered (1) that a permanent injunction issue enjoining defendants from interfering in any way with plaintiff's communicating with the courts and from reading the contents of plaintiff's communications addressed to courts or to attorneys representing him as counsel of record in any court proceedings; and (2) that defendants credit against plaintiff's term of imprisonment imposed on June 10, 1965 the amount of good time lost, either by revocation of earned good time or inability of the plaintiff to earn good time, as a result of the three punishments herein held to be unlawful, namely, (a) segregation from March 28 to approximately May 28, 1968, (b) loss of 60 days' good time imposed on March 2, 1969 and (c) transfer to D.S.U. from February 17 to April 29, 1969.