**Benjamin TYREE, Petitioner,**

v.

**John J. FITZPATRICK et al.,**
**Respondents.**

**Civ. A. No. 70–1323–C.**

United States District Court,
D. Massachusetts.

March 9, 1971.

Richard S. Chute, Hill & Barlow, Boston, Mass., for petitioner.

Charles E. Chase, Asst. Atty. Gen., Crim. Div., Boston, Mass., for respondents.

## OPINION

CAFFREY, District Judge.

This is a civil action by a state prisoner against the Commissioner of Correction of the Commonwealth of Massachusetts, the Superintendent of the Massachusetts Correctional Institution at Walpole, and the Superintendent of the Massachusetts Correctional Institution at Concord. Jurisdiction of this court is invoked on the basis of 28 U.S. C.A. 1343, on the ground that the action arises under 42 U.S.C.A. 1983. The amended complaint alleges violations of the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States.

Briefly stated, the facts which give rise to this case are that petitioner entered the Massachusetts Correctional Institution at Walpole in March 1967; was transferred in September 1967 from Walpole to the hospital at the Massachusetts Correctional Institution at Norfolk; and was returned to Walpole in December 1967, where he remained until about June 3, 1969, at which time he was transferred from Walpole to the Massachusetts Correctional Institution in Bridgewater. On January 9, 1970, he was transferred to the hospital at Massachusetts Correctional Institution at Norfolk for further treatment of the same ulcer condition which caused his hospitalization at Norfolk in September 1967. In February 1970, he was transferred to Walpole and on July 3, 1970 he was transferred from Walpole to the Massachusetts Correctional Institution at Concord. On September 16, 1970 he was returned to Walpole, and on November 16, 1970 he was again transferred from Walpole to Concord. Petitioner alleges that as a result of these numerous transfers, out of the 21-month period immediately prior to the filing of the complaint he had spent 13 months in segregation, 2 months in the hospital, and approximately 6 months in the general prison population.

The first count of the amended complaint recites that petitioner was sentenced by a disciplinary panel at Walpole on five separate occasions to serve an aggregate of 23 days in solitary confinement at Walpole, but that one of these sentences for five days was suspended. It is further alleged that petitioner has lost 54 days "good time" credit as a result of the various solitary confinements. The complaint alleges that his confinements to segregation units, or solitary confinement, and the denial of access to the services of a medical doctor on several occasions, amount to cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the Constitution.

The second count of the complaint alleges that the foregoing conduct on the part of respondents amounts to violation of petitioner's rights under the due process clause of the Fourteenth Amendment and also various provisions of the First, Fifth and Sixth Amendments to the Constitution.

A third count alleges that censorship of his incoming and outgoing mail, and refusal to mail certain communications, also violate unspecified rights of petitioner and operate to deny him access to this court.

The matter came before the court for hearing on the basis of petitioner's motion for a preliminary injunction. Petitioner called as witnesses the respondents John J. Fitzpatrick, Commissioner of Correction of the Commonwealth of Massachusetts, and James L. O'Shea, Superintendent of the Massachusetts Correctional Institution at Concord. Respondents called as a witness Arthur Isberg, attorney for and assistant to respondent John J. Fitzpatrick.

The evidence adduced at the hearing indicates that members of the general prison population spend the daytime hours working or attending school. They have recreation in the prison yard and eat in a common diningroom with

all other members of the prison population. In contrast, a prisoner in segregation at Concord stays in his own cell for 23 or 23½ out of each 24 hours; he is not allowed to mingle with other members of the prison population; he is allowed from 30 minutes to an hour a day outside his cell for exercise; and he is not allowed to work, to visit the library, or to attend movies or religious services. He is permitted to obtain books from the library, he is allowed the use of a radio, and he can be visited in his cell whenever necessary by a member of the medical staff. The cell in which he is incarcerated is 5' x 8' in area, contains a bed, a chair, a toilet, drinking fountain, and radio.

Tyree was committed to segregation because of an incident involving him and three other people which occurred on September 18, when the four men refused to return to their cells. He was believed by prison authorities to be the leader of this rebellion. Superintendent O'Shea testified that he requested the Commissioner to send Tyree, but not the others, to segregation, because, on the basis of his experience during his thirty-five years in the Department of Correction, he felt that removal of the ringleader would tend to avoid the risk of the situation becoming aggravated, and that, in requesting segregation only for Tyree, he had in mind the contents of the prison file on Tyree as well as the contents of the files of the other three men. Petitioner's file indicated that he had been ordered into segregation in April and May 1969 and from June of 1969 to January of 1970.

▮ As of the time of the hearing, petitioner had been in the segregation unit about 4½ months. The decision as to when he will be released is up to the Commissioner of Correction. Commissioner Fitzpatrick testified that he authorized the segregation for an indefinite period and that the basis of the segregation order was his opinion that Tyree's record and the particular incident, taken together, indicated that Tyree was a threat to the good order of the institution. He further testified that prisoners are released from the segregation unit on the basis of their behavior there, which is evaluated weekly by a deputy commissioner who visits segregation units for that purpose.[1] Fitzpatrick also testified that he is well aware that Tyree has an ulcer condition and that no denial of medical care is involved in his being in a segregation unit. He testified that segregation averages out at about six months, some prisoners serve less, some serve more, that the periodic (weekly) status reports are filed on prisoners in segregation, and that some prisoners are in segregation for their own protection and at their own request. He further testified that there are about 35 prisoners in segregation, that a prisoner is entitled to a hearing before being sent to segregation, and that a hearing was given to Tyree. He conceded that the prisoner has no right to counsel at the hearing, nor to call or cross-examine witnesses, nor is there a panel to which the decision can be appealed.

▮ The recent decision by the Court of Appeals for the Second Circuit, sitting *en banc*, in Sostre v. McGinnis et al., 442 F.2d 178 (1971), directs that petitioner's legal contentions regarding cruel and unusual punishment and denial of procedural due process are not well taken on the basis of the evidence ad-

---

1. While, ideally, the weekly evaluation of prisoners in segregation, for the purpose of determining whether they are fit and ready to be returned to the general prison population, would be conducted by an impartial state official not under the control of the Commissioner of Correction, such a procedure cannot be mandated by this court, whose responsibility is to determine whether the present procedure passes constitutional muster. As we are reminded in Sostre v. McGinnis et al., 442 F.2d 178, at 197 (2 Cir. Feb. 24, 1971), selecting the appropriate procedure to determine when to discharge a prisoner from segregation "is a judgment entrusted to state officials, not federal judges."

duced at the hearing on the motion for a preliminary injunction. It is clear that Tyree, just as Sostre, has substantial control over the time when he is to return to the general prison population, since his behavior in the segregation unit is largely determinative of when he is "fit" to be returned to the general prison population without his so doing constituting a threat to the security of the institution or the safety of the other prisoners.

There has been no showing herein of any possibility, let alone probability, of success, on the basis of the claimed denial of Eighth Amendment rights. As was pointed out by the court in *Sostre,* (at 191):

"For a federal court, however, to place a punishment beyond the power of a state to impose on an inmate is a drastic interference with the state's free political and administrative processes. * * *

"* * * we have in the past declined to find an Eighth Amendment violation unless the punishment can properly be termed 'barbarous' or 'shocking to the conscience.' * * * Although the conditions Sostre endured were severe, we cannot agree with the district court that they were 'so foul, so inhuman, and so violative of basic concepts of decency,' * * * as to require that similar punishments be limited in the future to any particular length of time. * * *

"It is undisputed on this appeal that segregated confinement does not itself violate the Constitution. * * * Indeed, we learn that a similar form of confinement is probably used in almost every jurisdiction in this country and has been described as one of 'the main traditional disciplinary tools' of our prison systems. * * *

"* * * In several states, however, incarceration in segregated cells seems to be for an indefinite period, as it is in New York. The federal practice appears to be that prisoners shall be retained in solitary 'for as long as necessary to achieve the purposes intended,' sometimes 'indefinitely.' Furthermore, 'willful refusal to obey an order or demonstrated defiance of personnel acting in line of duty may constitute sufficient basis for placing an inmate in segregation.' "

With regard to the procedural due process question, the Court of Appeals in *Sostre* observed:

"Thus, we do not doubt that Sostre was entitled to 'due process of law' before he was punished for an infraction of prison rules. * * * The difficult question, as always, is what process was due. * * * (at 196)

"Beyond the process of guilt determination and initial incarceration, courts have displayed greater reluctance to import all the trappings of formal due process. * * * Certainly, formal rules of evidence would be entirely inappropriate at a disciplinary proceeding. * * * There is correspondingly less need for cross-examination and calling of witnesses. (at 196)

"Most important, we think it inadvisable for a federal court to pass judgment one way or another as to the truly decisive consideration, whether formal due process requirements would be likely to help or to hinder in the state's endeavor to preserve order and discipline in its prisons and to return a rehabilitated individual to society. * * * (at 197)

"We would not presume to fashion a constitutional harness of nothing more than our guesses.

"* * * we are not to be understood as disapproving the judgment of many courts that our constitutional scheme does not contemplate that society may commit lawbreakers to the capricious and arbitrary actions of prison officials. * * * In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him * * * and

afforded a reasonable opportunity to explain his actions. See Nolan v. Scafati, 306 F.Supp. 1 (D.Mass.1969) [vacated 430 F.2d 548 (1 Cir. 1970)]. (at 198)"

In Nolan v. Scafati, the Court of Appeals made the same point more succinctly, saying (at 550):

"While all the procedural safeguards provided citizens charged with a crime obviously cannot and need not be provided to prison inmates charged with violation of a prison disciplinary rule, some assurances of elemental fairness are essential when substantial individual interests are at stake."

Having in mind both the opinion of the Court of Appeals for this Circuit in *Nolan* and the opinion of the Court of Appeals for the Second Circuit in *Sostre*, I rule that there has been no showing that petitioner herein was denied elemental fairness prior to his being ordered into segregation. There is evidence that he had a history of substantial misconduct on a number of occasions while incarcerated in various Massachusetts correctional institutions, that he was called before a prison official for a hearing, advised of the charge against him, and given an opportunity at the hearing to explain away the charge and to give his version of the events. This procedure would appear to provide at least the "some assurances of elemental fairness" required by the guidelines set out in *Nolan, supra*.[2]

■ Finally, on the question of access to the court, it cannot be doubted that petitioner has a right to communicate freely with this court and with his counsel, as a corollary of which it is beyond the power of prison officials to refuse him the privilege of sending and receiving mail. In Nolan v. Scafati, the Court of Appeals observed (at 551):

"* * * an inmate's right of access to the court involves a corollary right

to obtain some assistance in preparing his communication with the court. Given that corollary right, we fail to see how a state, * * * can prevent an inmate from seeking legal assistance from bona fide attorneys * * *.

"* * * We are satisfied, however, that the right of reasonable access to the courts and its corollary right to obtain assistance—extends to inmates using 42 U.S.C. § 1983 to remedy denials of constitutional rights occurring during incarceration."

The handling of prisoner mail and the question of what constitutes "reasonable access to the courts" has been the subject of several opinions among the various district courts of this circuit. Three cases have been decided, each of which contains a ruling somewhat different from the other two. In Green v. State of Maine, 113 F.Supp. 253 (D.Me. 1953), Judge Woodbury (sitting as a district judge) made the ruling that:

"the opening and inspection of mail passing back and forth between prisoners and those at liberty is an ordinary, usual and obviously essential incident to the safe custody of prisoners. The practice violates no constitutional right of which I am aware." (p. 256)

The power of prison officials to examine mail was restricted to letters generally incoming by the District Court for the District of Rhode Island in Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I. 1970). The court ruled, with regard to letters generally outgoing (at 791):

"The reading of any outgoing mail from the inmates is unnecessary and in violation of the First Amendment rights of the parties involved unless pursuant to a duly obtained search warrant, and in the absence of the same no outgoing prisoner mail may be opened, read or inspected."

2. The present procedure undoubtedly leaves room for improvement. Cf. fn. 1. Nevertheless, it was approved in Meola v. Fitz-

patrick, 322 F.Supp. 878, 886 (D.Mass. 1971).

Still more recently, another judge of this court, in Meola v. Fitzpatrick, 322 F.Supp. 878 (D.Mass.1971), has ruled:

> "Censorship of the content of prisoners' petitions to the courts violates the First Amendment. At the hearing, no justification for such a practice was given; and none is apparent except the trivial one of protecting the sensibilities of court officials. There is no valid prison interest in screening and controlling the content of court papers sufficiently compelling so as to limit a prisoner's constitutional right to free and unfettered access to the courts." (p. 885)

On the appellate level, however, both the Courts of Appeals for the Second and the Eighth Circuits have ruled, within the past year, that prison officials may open and read all incoming and outgoing correspondence to and from prisoners. The opinion in each case makes it clear that prison security was the paramount consideration behind the appellate courts' rulings.

In *Sostre, supra,* the Court of Appeals for the Second Circuit expressly declined to forbid the opening of mail by prison officials, although it did (at 200 of 442 F.2d):

> "forbid prison authorities to delete material from, withhold, or refuse to mail a communication between an inmate and his attorney, * * * or any court, or any public official, unless it can be demonstrated that a prisoner has clearly abused his rights of access."

and the Court concluded with the caveat (at 201):

> "We need only add that when we say there may be cases which will present special circumstances that would justify deleting material from, withholding, or refusing to mail communications with courts, attorneys, and public officials, *we necessarily rule that prison officials may open and read all outgoing and incoming correspondence to and from prisoners.*" (Emphasis added.)

A similar ruling was made in Burns v. Swenson, 430 F.2d 771, at 777 (8 Cir. 1970), where the court observed:

> "There is * * * a weighty interest in the security and orderly administration of the internal affairs of the penal institution. Thus, we are led to the conclusion that an inmate of the Missouri Penitentiary should not be given a carte blanche mailing privilege * * *.
>
> "Accordingly, the district court's order is modified by ingrafting thereon the limitation that correspondence with the ACLU may be subjected to reasonable regulation consistent with legitimate policies of internal prison administration and security, so long as such regulation does not become a subterfuge to deny Burns access to the ACLU, and through it, to the courts."

█ In the light of the rulings by the Courts of Appeals of both the Second and Eighth Circuits, an injunction will not be entered herein forbidding Massachusetts correctional institution officials from opening mail, either incoming or outgoing, but, on the contrary, an injunction will be issued directing that the respondents herein may not delete or excise material from, withhold, or refuse to mail, communications from petitioner to courts, attorneys, or public officials.

Order accordingly.