**Minford Leroy WORLEY, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**V. Lee BOUNDS, Commissioner of the North Carolina Department of Correction, et al., Defendants.**

**Civ. No. 2703.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Feb. 23, 1973.

---

George S. Daly, Jr., Casey & Daly, William K. Diehl, Jr., James & Williams, Charlotte, N. C., and Norman B. Smith, Greensboro, N. C., for plaintiff.

Robert Morgan, Atty. Gen., and Jacob L. Safron, Asst. Atty. Gen., North Carolina Dept. of Justice, Raleigh, N. C., for defendants.

## MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

This suit seeks relief under 42 U.S.C. § 1983 for several alleged deprivations under color of state law by North Carolina prison authorities of plaintiff's rights under the Constitution of the

United States, particularly the First, Fifth, Sixth, Eighth and Fourteenth Amendments. At all times pertinent to the case plaintiff, Minford Leroy Worley, was an inmate of the North Carolina prison system, serving a four-to-six-year sentence upon conviction of a felony; and the defendants are the North Carolina Department of Correction and its chief executive officers, and various prison officials and agents. An evidentiary hearing was held and the parties have submitted memoranda on the various issues involved.

The case involves incidents and actions which are of limited scope and the court in its discretion determines that a class action is not properly maintainable. See Wright v. McMann, 321 F.Supp. 127, 137 (N.D.N.Y.1970); Carter v. McGinnis, 320 F.Supp. 1092, 1097 (W.D.N.Y.1970).

The facts and legal conclusions as to each alleged constitutional violation will be treated as a complete and separate unit in this opinion.

### 1. Denial of the Right to Correspond with the Mother of His Child.

Plaintiff Worley (a Negro) was married in August, 1960, to Christine Shealy Worley, a Negro, and is the father of a child, Gretchen, daughter of Christine Worley. He has been separated from his wife, Christine, since 1960, and she and the child, Gretchen, live in Wichita, Kansas.

The plaintiff is also the father of a second child, Michael Scott Christopher, born in the spring of 1969, several months after Worley began serving his sentence. The mother of that child is Kathi Estes, an unmarried white woman.

In December, 1968, Worley began serving his sentence at the Cleveland County (Shelby) unit of the prison system. There he was allowed to correspond with Kathi Estes. In February of 1969 he was transferred to the Iredell County (Statesville) prison unit. There he was not allowed to correspond with Kathi Estes, who was about to become the mother of his child. The defendant Forrester, superintendent of the Iredell prison unit, said to him, "I'm not going to O.K. it, stud. If you can get someone further up the line, O.K."

Worley was transferred to Central Prison in Raleigh. He requested that Kathi Estes be put back on his correspondence list, and permission was refused because of a stated prison department policy "that a married man cannot correspond with another woman."

Worley in April of 1969 was transferred back to the prison unit at Shelby and remained there until November of 1969. While at Shelby he was allowed to write to the child, who was born in April of 1969, but he was not allowed to write to Kathi Estes. The defendant Ralph Scism, assistant superintendent of the Shelby unit, gave the following reasons to Miss Estes:

"According to our file inmate Worley has never gotten a divorce from his first wife and that makes it against the rules and regulation for me to put your name back in his correspondence and visitors list, furthermore Captain Forrester of the Iredell County Unit must have had some reason for removing your name from inmate Worley's correspondence and visitors list. Therefore I am denying your request." (Plaintiff's Exhibit 1.)

While in the Shelby unit Worley was allowed to write to an unmarried *black* girl of his acquaintance, unrelated to him, and he wrote letters for another black, married prison inmate, to a 29-year-old black woman who was not his wife but was the mother of a child or children by the inmate, William Alexander.

In November, 1969, plaintiff was transferred to the Huntersville, North Carolina prison unit, where again he was not allowed to correspond with Miss Estes. His letters to her were returned.

In January of 1970 he was transferred to Camp Greene prison unit, also in Mecklenburg County, where he was again denied the privilege of writing to his son or to Miss Estes because he already had a wife and child.

The plaintiff attempted to smuggle letters out through another inmate and was unsuccessful and was threatened with punitive segregation if he persisted.

In addition to previous denials, Chaplain Thomas E. Dunn of the Department of Correction wrote plaintiff's attorney on September 2, 1969, that "[i]t is a Department policy that a married man cannot correspond with another woman." (Plaintiff's Exhibit 3.) Chaplain Dunn also expressed himself about the moral issues in the situation. Mr. Dunn also wrote on September 30, 1969, had further comment on the moralities involved, and adhered to the proposition that he would approve communication with Miss Estes after Worley was divorced legally from his former wife.

The administrative regulations of the North Carolina prison department as they then existed included, in pertinent part, the following:

"(5) . . . Immediate relatives of an inmate shall be approved as regular correspondents and/or visitors unless a good reason can be shown why the inmate's request should be denied. Immediate relatives shall include father, mother, foster parents, grand-parents, brothers, sisters, husband, wife, and children. Other relatives and friends of the inmate may be approved as regular correspondents and/or visitors if the officer in charge believes they will have a constructive influence on the inmate.

"(6) Changes may be made in the list of regular correspondents and visitors when requested by the inmate if approved by the officer in charge of the unit. This officer may remove the name of any person who violates mail regulations or visiting regulations, or whose letters or visits are having a negative influence on the inmate. When an inmate is transferred, the officer in charge of the receiving unit shall check the list of approved correspondents and visitors and make any changes he may deem necessary."

The plaintiff was divorced in September, 1970. He reported the fact to the officer in charge of his unit and after that time was allowed to correspond with Kathi Estes.

■ Prison authorities have considerable discretion in regulating ordinary mail, McCloskey v. Maryland, 337 F.2d 72 (4th Cir. 1964); Diehl v. Wainwright, 419 F.2d 1309 (5th Cir. 1970); United States v. Stahl, 393 F.2d 101 (7th Cir. 1968), cert. den. 393 U.S. 879, 89 S.Ct. 181, 21 L.Ed.2d 152 (1968).

■ However, the refusal to allow Worley to write to the mother of his own son was an act of discrimination against Worley because of either (a) the interracial nature of the liaison which produced the child, or (b) the illegitimacy of the child, or both. The defendants' acts in allowing other black men to correspond with *black* women who were mothers of their illegitimate children but not their wives make these conclusions almost inescapable. Discrimination because of race violates the constitutional right to equal protection of laws, McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). Discrimination because of illegitimacy of the child is also invidious and impermissible, and is not justified by any evidence in the record nor by any imagined or revealed state interest. Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); Williams v. Richardson, 347 F.Supp. 544 (3–J.Ct., W.D.N.C.1972).

2. *Censorship of Letters from Plaintiff to His Lawyer.*

■ While at Shelby plaintiff wrote Attorney Martin Miller a letter containing some statements critical of prison authorities. The letter was intercepted, and plaintiff was required to rewrite it before being allowed to mail it. This censorship of mail to a lawyer was

contrary to the then existing prison mail regulations and to the First and Fourteenth Amendments to the Constitution of the United States. See, Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I. 1970). Prisoners must be afforded free and uninhibited access to administrative, judicial and legislative forums in order to seek redress of grievances against state officials. An open pipeline to the courts and other public officials is essential to allow uncensored official scrutiny of prisoner complaints. See, e. g., Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Coleman v. Peyton, 362 F.2d 905, 907 (4th Cir. 1966); Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970); Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D.N.Y.1970); Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971). See also, Nolan v. Fitzpatrick, 326 F.Supp. 209 (D.Mass.1971).

### 3. Denial of Privilege of Reading the Book "SOUL ON ICE."

In the summer of 1969, after returning to the Shelby prison camp, Worley ordered by mail a copy of Eldridge Cleaver's book, "SOUL ON ICE." The book was not delivered. In an interview with the captain in charge of the unit, the captain displayed the book and said that it was Worley's book but that he was not letting Worley have it because "there are too many weak-minded people in this unit" for the book to be read there. Worley had never read the book, he said, just heard it was a good book. He knew that Cleaver was a Black Panther but did not know his philosophy. He assigns the suppression of his book as an unwarranted interference with his mail, and as an instance of racial discrimination.

Defendants maintain that Cleaver's book preaches race hatred and is likely to precipitate violence in the prisons.

Recent decisions indicate that in the First Amendment "preferred freedom" area courts should carefully scrutinize administrative claims that religious or political works should be banned in prison because of their *potential* violent impact. "[P]risoners retain substantial first amendment rights despite conviction and incarceration." Brown v. Peyton, 437 F.2d 1228, 1230 (4th Cir. 1971). See also, Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Walker v. Blackwell, 411 F.2d 23 (5th Cir. 1969); Pierce v. LaVallee, 293 F.2d 233 (2nd Cir. 1961).

The conclusion that prisoners retain certain First Amendment rights does not mean that prisoner access to reading materials is unlimited. Certain restrictions may be justifiable as "part of the punitive regimen of a prison," Brown v. Peyton, *supra*, 437 F.2d at 1231. For example, prison authorities may legitimately limit access to reading matter to prevent prison unrest or to punish misbehavior in prison. However, the *Brown* case makes it clear that the burden is on the state to demonstrate that a paramount state interest requires complete suppression of particular materials. [While Brown v. Peyton deals with largely *religion*-oriented literature, the test which that case lays down, i. e., a "convincing showing that paramount state interests" require suppression, appears to be equally applicable to access to predominantly *political* dialogue.]

Brown v. Peyton was remanded by the Court of Appeals to the district court for a plenary hearing to determine whether the denial to the prisoner of the materials involved was justified by a superior state interest. Since the *Brown* opinion was filed after the hearing in this case, the defendants had not had an opportunity at the time of the hearing to apply the *Brown* standard to "SOUL ON ICE." Certainly, the reason given to suppress the book, i. e., that "there are too many weak-minded people in this unit," will not pass muster under *Brown*. First Amendment rights are not so easily diluted. Thousands of copies of "SOUL ON ICE" have been sold and read, apparently without causing violence. If, as Judge Winter says in *Brown*, "rehabilitation is a moral and intellectual process," prisoners such as the plaintiff should be given freedom to

explore political and social philosophies (even unusual or unpopular philosophies), *as long as* there is no supervening superior state interest. See, for a discussion of the possible benefits of religion on the rehabilitative process. Barnett v. Rodgers, 133 U.S.App.D.C. 296, 410 F.2d 995, 1002 (1969).

 Therefore, in light of Brown v. Peyton, plaintiff's request to read his copy of "SOUL ON ICE" should have been more carefully treated by the defendants. For example, if authorities feel a certain publication will be detrimental if widely distributed within a particular prison unit they should consider alternative "less onerous" means (such as giving the plaintiff an opportunity to read the book for prescribed hours a day in solitary). See the separate opinion of Judge Craven in Abernathy v. Cunningham, 393 F.2d 775 (4th Cir. 1968).

Since this suit was filed, the defendants have amended their regulations on publications inmates may receive. We are advised that plaintiff has now received "SOUL ON ICE" and that the Commissioner's Committee on Publications has thus far ruled in favor of allowing inmates to possess all publications on which appeal has been taken. No action on this issue by this court now appears indicated.

4. *Denial of Due Process by Punishment Without a Hearing.*

Worley has twice been subjected to disciplinary segregation. While imprisoned at Shelby he was taken to the Dallas prison camp and served eleven days in punitive segregation (confinement with another inmate in a 6' x 8' cell on limited rations) for trying to "block out" a letter (smuggle a letter out) through another inmate. The record does not show that any hearing was conducted before Worley was so punished, although he admitted in court that he did attempt to "block out" the letter.

In August of 1970, while plaintiff was at the Shelby prison unit, he was working on a road crew in Rutherford Coun-

ty. A left-handed inmate was ordered to use his shovel as would a right-handed man. When he refused or was unable the foreman sent the inmate back to the camp for punishment. The seven men on the work squad agreed to visit Captain Lee and protest the punishment of the inmate. Captain Lee called the men in and interviewed them one at a time. Worley was one of those in the group, but neither the first nor the last. Next morning he was called before camp officials and charged with "agitating" and sentenced to three to thirty days in disciplinary segregation, again at the Dallas prison camp. Captain Lee, who had interviewed Worley and the other men, was not even present for this "hearing." Worley served nine days of disciplinary segregation in the same two-man cell at Dallas with another inmate.

 At least minimal due process requirements must be met before prison authorities can utilize intra-prison disciplinary measures such as punitive segregation and loss of accrued good time. In Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970), rev'g. Nolan v. Scafati, 306 F.Supp. 1 (D.Mass.1969), the First Circuit Court of Appeals reversed District Judge Wyzanski's dismissal without a hearing of a prisoner's claim that he had been wrongfully subjected to punitive segregation without procedural due process. The Court said 430 F.2d at p. 550:

"On remand, the district court shall, by affidavit and/or hearing (and we stress that many such claims by prisoners may be satisfactorily resolved by affidavit), ascertain the cause, nature, and duration of petitioner's confinement; the consequent effect, if any, on his earned good time credit and the nature of the safeguards provided at any prison hearing which may have been accorded petitioner. This having been done, the district court should confront the admittedly difficult—and still largely unexplored—question whether the punishment here proposed or inflicted was sufficiently great to require procedural safeguards, and if it was, whether suffi-

cient safeguards were provided. While all the procedural safeguards provided citizens charged with a crime obviously cannot and need not be provided to prison inmates charged with violation of a prison disciplinary rule, *some assurances of elemental fairness are essential* when substantial individual interests are at stake." (Emphasis added.) (Reference to footnote deleted.)

See also, Meola v. Fitzpatrick, 322 F. Supp. 878 (D.Mass.1971).

In Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y.1970), Judge Motley held that due process in the context of New York State prison life required (1) the furnishing of a copy of the charges; (2) a recorded hearing with an opportunity to cross-examine witnesses; (3) right to retain counsel or a counsel substitute; and (4) a copy of the decision of the hearing officer setting forth the evidence and the reasons for the decision, before a prisoner could be punitively disciplined. On appeal, Judge Motley's order with respect to the detailed elements she said were required by procedural due process, was reversed, Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971) (*en banc*). Nevertheless the Court of Appeals did recognize that some minimal due process was required. The Court, per Judge Kaufman, stated at p. 198:

> "In thus rejecting Judge Motley's conclusions, however, we are not to be understood as disapproving the judgment of many courts that our constitutional scheme does not contemplate that society may commit lawbreakers to the capricious and arbitrary actions of prison officials. If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. This is not a concept without meaning. In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, see Armstrong

v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), and afforded a reasonable opportunity to explain his actions." (Reference to footnotes deleted).

Cf., Thompson v. Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); United States ex rel. Campbell v. Pate, 401 F.2d 55, 57 (7th Cir. 1968).

See also, Note, "Beyond the Ken of the Courts: A Critique of Judicial Refusal To Review the Complaints of Convicts," 72 Yale L.J. 506, 526 ff. (1963).

Procedural due process is especially important in the context of prison life because of the tremendous arbitrary power delegated to prison authorities. The punishment afforded plaintiff for his alleged "agitating" is sufficient example. Worley was charged and "sentenced" without an opportunity to defend his actions. Whether his "agitating" consisted of, for example, a petitioning for better prison conditions, an isolated sarcastic remark to a guard, or an attempt to incite to violence is unclear.

> "Prisoners often have their privileges revoked, are denied the right of access to counsel, sit in solitary or maximum security or lose accrued 'good time' on the basis of a single, unreviewed report of a guard. When the courts defer to administrative discretion, it is this guard to whom they delegate the final word on reasonable prison practices. This is the central evil in prison. It is not homosexuality, nor inadequate salaries, nor the cruelty and physical brutality of some of the guards. The central evil is the unreviewed administrative discretion granted to the poorly trained personnel who deal directly with prisoners. The existence of this evil necessarily leads to denial of communication, denial of right to counsel and denial of access to the courts. Prison becomes a closed society in which the cruelest inhumanities exist unexposed.

It is only with this factual background that one can evaluate the law affecting the internal affairs of prisons." Hirschkop and Millemann, "The Unconstitutionality of Prison Life," 55 Va.L.Rev. 795, 811–812 (1969).

 Precise procedural requirements may differ depending on the offense charged. On the present record, it appears that once Worley admitted that he attempted to "block out" a letter, little if any additional hearing was required. On the other hand, the vagueness of the term "agitating" requires more careful consideration so as to prevent punishment at the whimsy of a prison guard. At the very least, plaintiff under the circumstances of this incident ("agitating") was entitled to:

(1) A written copy of the charges against him;

(2) Confrontation with his accuser;

(3) An opportunity to explain his actions; and

(4) A written explanation of the decision of the hearing officers.

Such procedures do nothing more than reinforce the rehabilitative aim of prison life. For, if a prisoner is expected to re-enter society with a willingness to obey society's rules, his prison, his "training center," must present a rational and reasonably fair atmosphere for experimentation and learning.

The North Carolina prison system administration has been in the forefront in attempting to acclimate prisoners to life in the outside world. Numerous prisoners participate in work release programs. Many attend community colleges as full time students. During 1970, approximately 6,600 home visits were sanctioned for qualified inmates. The use of defined and precise corrective and disciplinary procedures within prison walls can only enhance prison authorities' dedication to prepare inmates for the outside world. Many inmates, because of economic poverty or circumstances of personal history, have seen only the harshest aspects of civilized life. Rational and fair processes within

prison can only aid in showing a willing prisoner the benefits of orderly procedures. At the same time, such procedures will provide an opportunity to deal swiftly and justly with hardcore troublemakers.

Since this suit was filed, the defendants have adopted new disciplinary procedures which appear designed to provide the essentials of due process. It will be assumed unless shown to the contrary that these procedures will be followed and that no order of this court on this subject is required.

5. *Unconstitutional Prison Directives and Administrative Orders.*

Plaintiff's broad-based attack on the Department of Correction's directives and orders is beyond the scope of this case. Although the regulation prohibiting "agitating" (Sec. 2–213) does not meet the precise test of a criminal statute, nevertheless, if applied with the benefit of the procedures outlined above, it would appear to give rise to no constitutional claim. Consideration of the numerous other directives criticized must await specific controversies where they are formally challenged on facts concretely alleged and developed.

ORDER

1. Defendants shall expunge from petitioner's prison records all references to his punishment for "agitating" referred to above.

2. Plaintiff shall recover of defendant Forrester the sum of One Dollar ($1.00) as nominal damages for temporary denial of correspondence with the mother of his child.

3. Plaintiff shall recover of defendants Captain M. S. Lee and Lt. Ralph H. Scism the sum of One Dollar ($1.00) as damages for interference with his correspondence with Attorney Martin Miller.

4. After this suit was filed, prison authorities made wholesale changes in the prison regulations which now, as I read them, reduce the likelihood of future constitutional violations such as

those alleged by this petitioner in matters of correspondence; of censorship; of reading privileges; of punishment without a hearing; and the handling of discipline generally. It appears and the court will assume until further notice that such problems are not likely to arise under these new directives; therefore, no injunctive orders are entered, and the court wishes to compliment the prison authorities for their farsighted action in making these very sound improvements for the betterment of prison administration.

5. All other claims for relief are hereby denied.