James Everett BERCH, Plaintiff,

v.

Sheriff, Donald W. STAHL, et al. Defendants.

Ronald GIBSON, Plaintiff,

v.

Donald STAHL, Defendant.

Dewey LUCAS, Plaintiff,

v.

Donald STAHL, Defendant.

Nos. C–C–72–53, C–C–72–181, C–C–72–220.

United States District Court, W. D. North Carolina, Charlotte Division.

March 25, 1974.

414

George S. Daly, Jr., Charlotte, N. C., for plaintiffs.

Frank B. Aycock, III, and James O. Cobb, Charlotte, N. C., for defendants.

## MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

These cases were heard at Charlotte on February 20, 1973, having earlier been combined for testimony on all equity matters at issue. Pursuant to 42 U. S.C. § 1983, they challenge conditions and practices in the Mecklenburg County Jail, Charlotte, North Carolina, as unconstitutional under the First, Eighth and Fourteenth Amendments to the United States Constitution. Damages and equitable relief are sought. The court has jurisdiction under 28 U.S.C. § 1343(3). Defendant Stahl is and was at all times mentioned the Sheriff of Mecklenburg County and responsible for the keeping of prisoners at the Mecklenburg County Jail, see North Carolina General Statutes § 162–22. Defendants Maness and Green are, and were at all pertinent times, jailers and employees of the defendant Stahl.

### FINDINGS OF FACT

*The jail inmates and their accommodations.*—The Mecklenburg County Jail was first occupied in March, 1971. It has 370 bunks on the second and third floors, and a few more on the first floor used for temporary purposes. All persons not expected to be released in the near future are housed on the second and third floors. The average daily population of the jail in 1972 was 390 persons. The jail has contained as many as 450 to 470 inmates at one time. The jail is used to detain many categories of persons, including those awaiting trial on all types of charges, convicted misdemeanants and felons awaiting determination of their appeals, persons doing time for public drunkenness, persons on work-release programs, persons who are allowed to go home and to work on weekends, federal prisoners (see North Carolina General Statutes § 153–183), inmates of the North Carolina Department of Correction returned to Mecklenburg County for hearing of post-conviction writs, and juveniles who cannot be handled by the local juvenile diagnostic center. In 1972, the combined number of bookings and releases was about 36,000. Inmates stay in the jail from a few hours to a year or more. At any given time, approximately 200 of

the inmates are in for thirty days or longer. The average daily turnover (total of persons booked and those discharged) is ninety to ninety-five persons, but the turnover is higher on weekends and lower during the week. The Sheriff is obligated by law to receive and retain persons presented by certain law enforcement officers (see North Carolina General Statutes § 153–190.1).

Jail inmates are segregated according to various criteria:

(1) According to the *ad hoc* decisions of the Sheriff and jail personnel, as described later in this opinion;

(2) According to their particular legal status (*i. e.,* drunks, work release inmates, post-conviction petitioners, felons awaiting determination of their appeals in the North Carolina courts are kept together); and

(3) According to race (for persons sixteen and seventeen years of age).

The majority of the prisoners are housed in "regular" cells, which hold twelve, sixteen or eighteen persons. These cells are divided into two areas: a sleeping area with bunks, and a dayroom area which has several picnic-type tables and showers. Towels are provided three times a week, along with soap and razors for shaving. Sheets are changed once a week; meals are served three times a day. On the second floor the day area and the sleeping area are separated by bars, and one area may be locked off from another. The lighting in all prisoner areas of the jail is extremely dim. The court visited the jail at noon on one of the brightest days of the year, and there was not enough light to permit comfortable reading.

*What happened to Dewey Lucas.—* Plaintiff Dewey Lucas, age twenty-five, is presently confined in the North Carolina Department of Correction, serving sentences for common law robbery and crime against nature. His expected release date is 1979. Lucas is a Negro. On November 16, 1971, he was confined in the Mecklenburg County Jail, await-ing determination of his appeal on his common law robbery conviction. He was confined in a regular sixteen-man cell. At about 1:30 a. m. that day, the sole white male in Lucas's cell, then populated by the white man and by some fourteen Negroes including Lucas, was apparently the victim of a homosexual rape. A jailer (Mr. Isom) was attracted to the cell by loud noises, and discovered the victim alone and nude in the middle of the floor. The victim was taken out of the cell and into the adjacent corridor, whereupon the deputy in charge (Mr. Kea) arrived. Mr. Isom testified that the victim told him "Dewey Lucas is the instigator"; but Mr. Kea testified that the victim didn't know the name of his aggressors, but knew "what bunks they slept in." The prisoners in the cell were then made to stand by their bunks, and the victim, then or shortly previously hysterical, identified several of them as his attackers. He identified Lucas because he "remembered his voice," according to Mr. Kea. Without allowing Lucas any opportunity to make a statement, Mr. Kea made the determination to put Lucas into "S–4."

"S–4" is an area of the jail which consists of (a) four "barred door" single cells, each measuring approximately four feet by ten feet and equipped with steel bunk, toilet, basin, three solid walls and bars at one end; (b) three "solid door" single cells on the opposite side of a narrow corridor, equipped identically with the barred door cells, except that these three cells also have an additional sliding *solid* steel door having a glass window covered by a metal shield that may be lifted only from outside the cell; and (c) the "box."

The "box" is a metal container about five feet by seven feet, with solid steel walls and solid door, windowless, and *totally bare* except for an oriental toilet (a hole in one corner of the floor) flushable only from outside the cell. It has one dim light behind a glass pane on one wall, which sheds less useful illumination than a small candle.

Mr. Kea testified that Lucas was put into a barred door cell, then a few days later moved to "F–1" (another section of cells in the jail, identical with "S–4") and put into a solid door cell where he stayed until he left the jail some fifty-five days later. Lucas testified that he was first put in a solid door cell for two days, and then put in the "box" for four days; and that when he repeatedly beat on the walls and asked to see the Sheriff, a jailer came and took his clothes away, leaving him naked. He stated that he got two meals (Gibson says he got three) a day in the box, but no mail, no use of the telephone (even to call his lawyer), no writing materials, no "store box" (concessions), no tobacco, no exercise outside his cell, no visitors and no toothbrush, and that certain of his personal books (*Soul on Ice, Native Son, Black Pride*) were taken from him when he was placed in "S–4" and never returned. The defendant and his employees admit some and deny some of these deprivations, but claim that the deprivations were incidents of his confinement in a solid door cell and that he was not kept in the "box." Lucas testified that the oriental toilet was rarely if ever flushed and that the smell became almost unbearable.

The Sheriff testified that he had ordered Lucas put into a solid door cell because he was an "escape risk." He came to this conclusion because, as he testified, several days *after* Lucas had been put into "S–4" Lucas told him to his face, "When I get out of here, I will kill you." Apparently there were no other witnesses to this conversation and no attempt to carry out the threat, and the Sheriff made no "offense report" of it since he does not consider himself bound by the rule that an "offense report" should be made each time a prisoner is changed in the circumstances of his confinement for disciplinary reasons. Mr. Kea testified that he was the one who moved Lucas, but Kea gave no testimony of the alleged threat. The Sheriff nevertheless testified that he determined that Lucas should be transferred to a solid door cell, because the Sheriff now feared that if left in a barred cell Lucas would reach out through the bars and grab a jailer. Lucas was therefore put in dark and solitary confinement because he had been accused of a sexual assault, and kept there because of the threat.

The jail records do not reflect, beyond the notation of "S–4," the particular type of confinement within "S–4" in which Lucas was placed. The court visited "S–4" during the trial, and observed evidence (burned spots on the floor) of prior habitation in the "box." The Sheriff testified that during the past year or so the "boxes" had only been used for "mental" patients. The Sheriff has no policy on how long a prisoner may be kept in "S–4" or its equivalent elsewhere in the jail.

Lucas was subsequently charged with sexual assault and made a bargained plea of guilty of a crime against nature, on account of the sexual assault mentioned. He denies any association with the assault, other than having been asleep in the cell at the time.

Whether Lucas was, after his initial commitment to "S–4," confined in a solid door cell or in the box, the circumstances of that confinement were substantially more burdensome than he had suffered prior to the assault, or prior to the alleged threat. Either type of confinement tended to prevent him from communicating with friends, relatives, counsel and courts, and this restriction lasted for a period of seventy to eighty days. Mr. Kea testified that the restriction on telephone calls for one in "S–4" or a comparable cell—including telephone calls to attorneys—was "gradually eased" if the inmate was "cooperative." Sheriff Stahl testified that "if [an inmate is] in there ["S–4"] for disciplinary action, he does not make a phone call." Handwritten notes are at times taped to the outside door of cells in "S–4" announcing certain restrictions, including "no telephone calls," for a named inmate. Mr. Kea testified that such notes were destroyed after they had served their purpose. Attorneys

may visit prisoners at set times daily, even prisoners in the "box"; but Lucas was prevented from contacting an attorney while in "S–4" or its equivalent.

The court finds as a fact that Lucas was confined in the "box" for several days, and in the equally dark but less onerous solid door cell for seventy to eighty days.

There were no rules or records to suggest or show the circumstances, or even the particular place, of Lucas's confinement, and no procedure to identify and preserve relevant facts, and no testimony based on credible personal recollection to rebut Lucas's testimony.

*What happened to Ronald Gibson.*— Ronald Gibson, age eighteen, is presently confined in the North Carolina Department of Correction, serving a sentence for storebreaking and larceny. On September 16, 1971, he escaped from a cell in the basement of the Mecklenburg County Court House, where jail prisoners are held under the supervision of the Sheriff on days they are scheduled for court. At the time Gibson had not been convicted but was awaiting a preliminary hearing on the storebreaking and larceny charge, having been unable to secure his release following his arrest. He claims that he went out through a door that was inadvertently not locked, but he admits his willful escape and has been convicted of it. The next day, September 17, 1971, Sheriff Stahl, who knew Gibson by sight, personally recaptured him in Charlotte, and placed him in "S–4" in a barred cell, where the stayed until October 25, 1971. He had not then been tried on the storebreaking or the escape charge. On October 25, 1971, he was accused by a jailer of having placed a wad of paper in the door lock receptacle, so as to allow the bars to slide shut but prevent the lock mechanism from engaging. Gibson denies and then denied having put any paper in the lock. Nevertheless, he was then forcibly put into an adjacent cell by several jailers, and suffered some injuries in the process. As in the case of Lucas, the jailers say he was placed in a solid door cell; Gibson says he was placed in the "Box," and that while he was there he was restricted in the same manner Lucas had described. Again, defendants do not deny that one confined in a solid door cell gets no exercise outside his cell, no mail, no visitors except attorneys, no store box, no phone calls, and no writing materials, except as a jailer in his "discretion" might permit. Gibson says he was kept there two weeks or more and that upon his release he was given two letters addressed to him, one postmarked November 5, 1971 (Plaintiff's Exhibit No. 1), the other postmarked November 18, 1971 (Plaintiff's Exhibit No. 2). He was removed from such confinement shortly after his present attorney first visited him at the jail.

During 1972, Gibson was in the Gaston County Jail, having been transferred from the North Carolina Department of Correction to face pending charges. When these charges were dismissed, he was mistakenly released in open court rather than being returned to the North Carolina Department of Correction to complete his pending sentences. He came to Charlotte where he was later arrested in December, 1972, and put in the Mecklenburg County Jail, in a regular sixteen-man cell, to await return to the North Carolina Department of Correction. (This was several months after the filing of the present suit.) When Sheriff Stahl discovered that Gibson was in the jail, he caused him to be placed in a solid door single cell, *even though Gibson had not misbehaved in any known way during his then stay in the Mecklenburg County Jail.* Gibson was confined in the "solid door" manner, described above. When Stahl ordered him put in the solid door cell, Gibson asked the reason why. Stahl said it was because Gibson had sued him for $25,000, and if Gibson would drop the suit, he would not have to be in solitary.

The conditions of Gibson's punitive solitary confinement on the first occasion for about three weeks from and after October 25, 1971, and for several weeks preceding January, 1972, tended

to prevent him from communicating with friends, relatives, counsel and court.

*What happened to James Everett Berch.*—James Everett Berch, age twenty-five, is presently confined in the North Carolina Department of Correction, serving sentences for eight convictions of housebreaking and larceny. He was convicted in Mecklenburg County Superior Court on August 13, 1971, gave notice of appeal, and was held in the Mecklenburg County Jail pending determination of his appeal. On April 8, 1971, when Berch was originally placed in the jail, he was booked as "Robert Block, alias James Berch." During early June, 1971, he received a letter addressed to him as "Mr. James E. Berch" (Plaintiff's Exhibit No. 3), enclosing a $5.00 money order which was put in his "property bag" (the receptacle used by the jail to retain all personalty of an inmate which he is allowed to have with him during his time in jail). The jail personnel apparently had no trouble in knowing the cell in which he was then located. "S–2" is endorsed on the letter. Also they apparently had no trouble in locating his personal property bag. Thereafter, on June 21, plaintiff wrote to Sheriff Stahl as follows:

"Sheriff Stahls Sir.

"I am an inmate presently in custody in Mecklenburg County Jail, cellblock S–II.

"My name is James E. Berch alias Robert Block. I have been in custody here since April 8, 1971. I am from out of state, and a problem has arose, that I feel I should bring to your attention, in hope that you can straighten it out, before I am forced to take legal action.

"I'm not trying to cause any trouble. But I don't think that my wife and family are being treated fairly by the actions of this jail and its staff. How I'm treated is immaterial in this. But I don't feel that my family should be messed over like they have been, the past couple months.

"First of all, I would like to know, why my wife's letters to me have been returned to her, and marked 'not in jail'.

"As I said, I have been in custody here since April 8th. I have never been out of jail, over twenty letters in succession over a period of three weeks have been sent back, and I would like a reasonable answer as to why.

"My wife is about to have a baby, and my being here is bad enough on her. Her nerves are worn pretty thin. And the returning of those letters has caused her to go to the hospital, because of a semi-nervous breakdown. Believe me, I'm very upset over this, and I want to know what reasons you have for doing this.

"If this kind of action continues I will contact my attorney, and file a lawsuit against the staff of this jail. I sincerely hope I don't have to take this action. But unless this problem comes to a stop, I feel that I have the right to proceed with legal action.

"Thank you for your time and consideration in this matter.

Sincerely,
/s/ James E. Berch"

Sheriff Stahl replied, by endorsement on Berch's letter, as follows:

"Unless the mail was sent to you under the name of James Block, the name you used when you were arrested, the mail would have been returned. This is one of the problems that arise when one uses more than one name. The use of 2 names to get additional storebox money was also noticed and not appreciated. Have wife address mail to James Block.

/s/ Donald W. Stahl
Sheriff Meck County"
(Plaintiff's Exhibit 11)

Thereafter, plaintiff received in the due course of the mails a letter addressed to "James E. Berch" postmarked 12 August 1971. However, a letter clearly marked from the Clerk of this

(United States) court, addressed to "James E. Berch," postmarked September 23, 1971, was returned marked "Not in jail" and "Moved, left no address"; a letter addressed to "James E. Berch," postmarked October 30, 1971, was returned marked "Not in jail"; and a letter postmarked November 10, 1971, addressed to "James E. Berch," was returned marked "Not in jail." Letters to "Robert E. Block," postmarked December 11, 1971, were received by plaintiff as was, finally, a letter addressed to "James E. Berch" from the clerk of this court postmarked December 28, 1971. The September 23, 1971 letter from this court was postmarked on the very day that an "offense report" (Defendants' Exhibit No. 2) was prepared for "Robert Block alias Robert Berch." Plaintiff was known to the jailers and the Sheriff by both names.

*It is clear from Sheriff Stahl's reply to plaintiff's letter that he knew that plaintiff's name was James E. Berch, knew plaintiff was not receiving mail addressed to him, and did nothing at all to remedy the problem!* The result was that mail from various sources including this court, properly addressed to plaintiff by his true name, which was of record at the jail and personally known to Sheriff Stahl, was delayed or never delivered due either to some determination of the Sheriff that plaintiff should be punished for using an alias, for threatening legal action, for attempting to get double store box money, or for some other reason.

About September 30, 1971, someone in Berch's then cellblock broke a window on the exterior wall of the jail, situated across a narrow catwalk from plaintiff's cell. There is no evidence that plaintiff broke the window. On October 5, 1971, an announcement was made by a jailer from outside the cell that the entire cell would or might be put on "restriction," as a result of the breaking of the window. Someone inside the cell then told the jailer that he would knock him down if he opened the door. The jailer accused Berch, who denied the charge.

Stahl says he came up twenty minutes later and Berch admitted making the threat. No written record of such confession was made. Immediately, Berch was put in a barred cell for thirty-three days, without reading material, without exercise outside his cell, without receipt of correspondence, without use of the telephone, without a bath for thirty days, and without access to correspondence materials. Certain of his personal property, namely a transitor radio, $2.45 in cash, $4.00 in stamps, a box of envelopes and two writing tablets, two legal pads, 70 pages of legal research, one writ of habeas corpus, one court petition regarding jail conditions, 15 personal letters, 10 personal family photographs, one Bible and 4 hot rod magazines were taken away from him and never returned.

Berch was again put in a barred cell on February 25, 1972, for unauthorized possession of a razor blade, and was kept for thirty-two days. The jailer testified that he found the razor blade in Berch's pocket during a shakedown. On March 9, 1972, while still in the barred cell, plaintiff wrote a *pro se* complaint for filing in this court, which ultimately resulted in the appointment of counsel, an amended complaint, and the hearing on plaintiff's allegations. Berch requested Mr. Kea to notarize the complaint, and this was done in Stahl's presence. Stahl then examined the complaint, and thereafter, upon being returned to his cell, plaintiff was told by a jailer that he was not allowed to mail anything. He managed to smuggle the complaint out for mailing some time later, and it was filed in this court on March 27, 1972.

### CONCLUSIONS OF LAW

#### A.

#### CRUEL AND UNUSUAL PUNISHMENT

The Eighth Amendment prohibition against cruel and unusual punishment was applied to state action in Francis v. Resweber, 329 U.S. 459, 67

S.Ct. 374, 91 L.Ed. 422 (1947). It controls jail administrators as well as the judiciary and the legislature. Landman v. Royster, 333 F.Supp. 621, 646 (E.D. Va.1971); Jackson v. Bishop, 404 F.2d 571, 581 (8th Cir. 1968) (opinion by Blackmun, then Circuit Judge).

The Supreme Court many decades ago stated that punishments which by excessive length or severity are greatly disproportionate to the offense charged violate the Eighth Amendment. Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); O'Neil v. Vermont, 144 U.S. 323, 339, 12 S.Ct. 693, 36 L.Ed. 450 (1892) (dissent). A court must also view the punishment against "the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U. S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958).

In Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), a badly splintered Supreme Court ruled five-to-four that the death penalty as administered by Georgia and Texas constituted cruel and unusual punishment. The nine opinions comprised 232 pages and no consensus emerged. Justice Brennan attempted a thorough search for standards, and observed, in his concurring opinion, that:

> "The test, then, will ordinarily be a cumulative one: If a punishment is unusually severe, if there is a strong probability that it is inflicted arbitrarily, if it is substantially rejected by contemporary society, *and if there is no reason to believe that it serves any penal purpose more effectively than some less severe punishment*, then the continued infliction of that punishment violates the command of the Clause that the State may not inflict inhuman and uncivilized punishments upon those convicted of crimes. (Emphasis added.) *Id.* at p. 282, 92 S.Ct. at p. 2748.

■ With this guidance, this court concludes that solitary confinement for punishment purposes in itself is not cruel and unusual punishment *when administered within proper bounds*. However, solitary confinement for excessive durations is unlawful as offending the Eighth Amendment to the Constitution. Naturally, the reasonableness of a specific duration is affected by the type of isolation cell and the amenities accompanying the confinement.

Solitary confinement is an extremely severe form of punishment and as the evidence in this case demonstrates it is frequently inflicted in arbitrary fashion. Moreover, when used to excess it is implicitly denounced by contemporary society, which has directed other criminal sanctions for conduct sufficiently reprehensible to merit stiff discipline. Accordingly, the Eighth Amendment must be understood to place durational limits on the use of isolation as punishment.

Solitary confinement by definition means confinement alone and removed from sustained contact with other human beings. Its severity as punishment is drastically increased when the isolation is accompanied by the "sensory deprivation" which is, unnecessarily, attached to the isolation in the Mecklenburg jail. Not only are inmates of the "box" and inmates of solid door cells barred from visual contact and effective voice communication with others, but the cells are so bare and dimly lighted as to make it extremely difficult if not impossible (except for those with excellent vision and determination) to read, write, work on projects, or do anything except sit, think and feel. Mental and emotional stability are thus threatened, and mental health may be impaired. See Goldfarb and Singer, "Redressing Prisoners' Grievances," 39 Geo.Wash.L.Rev. 175, 200–201 (1970) and cases cited. Jail and prison authorities are authorized to confine, but not to torture and de-humanize prisoners.

■ The court rules that the following types of confinement, when utilized as punitive measures in this jail, violate

the Eighth Amendment prohibition against cruel and unusual punishment:

(i) Confinement in the "box" for periods longer than twenty-four (24) hours;

(ii) Confinement in the solid-door solitary confinement cells for periods longer than fifteen (15) days;

(iii) Confinement in the barred-door solitary confinement cells for periods longer than thirty (30) days; and

(iv) Depriving an inmate of the clothing necessary for warmth and modesty.

■■ Undoubtedly, solitary confinement facilities can be, and are, used for valid purposes other than punishment. For example, the sheriff may find it necessary to house security risks, known homosexuals, or those temporarily out of control because of anger, illness or other cause in the single-man cells. Additionally, it might be necessary in an overcrowded jail to confine some of the overflow inmates in the solitary confinement cells; or in the "temporary sorting-out" period new arrivals might be sequestered there; or, when occasionally the situation requires it, mentally disturbed persons might best be confined in solitary fashion pending removal to mental health facilities. (Needless to say, a prisoner put in solitary facilities for one of these or any other non-punitive reasons may not be denied regular prison privileges and amenities.) Such uses are constitutional, as are the punishment uses under the limitations previously described.

■ Any use of the solitary confinement quarters must be under sanitary conditions. Wright v. McMann, 321 F. Supp. 127 (N.D.N.Y.1970), aff'd in part and partially rev'd on other grounds, 460 F.2d 126 (2nd Cir. 1972), cert. denied, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972). The cells should be kept clean at all times and the toilets under the control of the guards should be flushed frequently. Lighting should be adequate for comfortable reading, Hamilton v. Landrieu, 351 F.Supp. 549, 554 (E.D.La.1972) and Rhem v. Malcolm, 371 F.Supp. 594, (S.D.N.Y.1974).

■ Deprivation of clothing as a means of punishment is not permissible under the Eighth Amendment when less offensive punishments are clearly available and just as effective. Landman v. Royster, 333 F.Supp. 621, 648 (E.D.Va. 1971). (If the deprivation is for "casting off" or for physical safety, facts to support the action should be found before the inmate is stripped.)

Support for these rulings, and for their constitutional basis in the Eighth Amendment, may be found in the authorities cited above, and also in the following decisions: Sinclair v. Henderson, 331 F.Supp. 1123 (E.D.La.1971); McCray v. State, 10 Cr.L. 2132 (2-Judge Court, Montgomery County, Maryland Court, November 11, 1971); Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark. 1971), 358 F.Supp. 338 (E.D.Ark.1973); Jones v. Wittenberg, 323 F.Supp. 93, 99 (N.D.Ohio 1971), aff'd, 456 F.2d 854 (6th Cir. 1972); Holt v. Sarver, 442 F. 2d 304 (8th Cir. 1971); Lollis v. New York State Department of Social Services, 322 F.Supp. 473 (S.D.N.Y.1970); Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); Rhem v. McGrath, 326 F.Supp. 681 (S. D.N.Y.1971); Sawyer v. Sigler, 320 F. Supp. 690 (D.Neb.1970), aff'd, 445 F. 2d 818 (8th Cir. 1971); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966).

### B.

### PROCEDURAL DUE PROCESS

■ In this jail, transfer of a prisoner from confinement in a "regular" cell (a twelve-man, sixteen-man or eighteen-man cell) to confinement in solitary fashion (in the "box" or in a solid-door

or a barred-door cell) is relegation of the prisoner to a lower, less desirable confinement status. A reduction in status constitutes punishment when not occasioned by one or more of the legitimate reasons outlined in the previous section of this opinion dealing with cruel and unusual punishment.

Prisoners in this jail are also subjected to other types of penalties. These penalties have included deprivation of "store box," restriction of exercise outside of cells, and limitations on reading material, use of the telephone, and non-attorney visitors.

■ Such punishments, some of which in the abstract appear to be minor deprivations, may in the context of confinement in prison constitute a very "grievous loss" to the disciplined prisoner. The due process clause of the Fourteenth Amendment requires that a prisoner be afforded an impartial hearing on alleged incidents of misbehavior for which he is to be punished if the possible punishment might constitute a "grievous loss" to him. Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L. Ed.2d 484 (1972); Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); Sostre v. McGinnis, 442 F. 2d 178 (2nd Cir. 1971); Worley v. Bounds, 335 F.Supp. 115 (W.D.N.C. 1973).

■ Certain minor and *temporary* punishments may be administered without automatically invoking a full *hearing* process. However, even if punishment is summary, fundamental fairness requires that the prisoner be entitled to notice of the alleged infraction for which he is being punished, Lambert v. California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), rehearing denied, 355 U.S. 937, 78 S.Ct. 410, 2 L.Ed.2d 419 (1958). Thus for every inmate disciplinary infraction which may result in the inmate's loss of privileges or reduction in status, written notification of the offense must be provided the inmate by the charging officer, *prior to* the imposition of punishment. In all cases where the possible penalty for the offense might involve a grievous loss, the prisoner must be given the opportunity to request a hearing on the charged offense.

■ The hearing must be conducted prior to the institution of the punishment, except where immediate action is necessary in emergency situations as, for example, when a prisoner must be segregated from the general population to protect the order of the jail or the safety of the inmates and jailers. Even in such emergency situations, however, the hearing is to be conducted as promptly as circumstances permit.

The hearing must include the following elements:

(a) An impartial hearing officer who was not involved in the transaction and who has not participated in an investigation of the charges.

(b) Reasonable advance oral or written notice to the prisoner of such hearing.

(c) A written description of the charges, given to the prisoner a reasonable time prior to the hearing.

(d) Disclosure at the hearing of the evidence against the prisoner.

(e) The right on the part of the prisoner to present witnesses at the hearing.

(f) The right on the part of the prisoner to confront and question his accusers.

(g) A short, written statement of conclusions prepared by the hearing officer and given to the prisoner.

Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); Inmates of Milwaukee County Jail v. Petersen, 353 F.Supp. 1157, 1167 (E.D.Wis.1973); McDonnell v. Wolff, 483 F.2d 1059,

1062–1063 (8th Cir. 1973); United States ex rel. Miller v. Twomey, 479 F.2d 701, 712–715 (7th Cir. 1973); Crafton v. Luttrell, No. 6615 (M.D.Tenn. September 13, 1973); Inmate 24394 v. Schoen, 363 F.Supp. 683 (D.Minn.1973); Crowe v. Erickson, Civ. 72–4101 (D.S.D. August 24, 1973); Pearson v. Townsend, 362 F.Supp. 207, 221–225 (D.S.C. 1973); Rinehart v. Brewer, 360 F.Supp. 105, 114–115 (S.D.Iowa 1973); Batchelder v. Geary, No. C–71–2017 (N.D.Cal. April 16, 1973); Collins v. Hancock, 354 F.Supp. 1253 (D.N.H.1973); Sands v. Wainwright, 357 F.Supp. 1062, 1079–1092 (M.D.Fla.1973); Worley v. Bounds, 355 F.Supp. 115 (W.D.N.C.1973); Collins v. Schoonfield, 344 F.Supp. 257 (D. Md., decree of July 27, 1972); Colligan v. United States, 349 F.Supp. 1233 (E.D. Mich.1972); Stewart v. Jozwiak, 346 F. Supp. 1062 (E.D.Wis.1972); United States ex rel. Neal v. Wolfe, 346 F.Supp. 569, 574–575 (E.D.Pa.1972); Landman v. Royster, 333 F.Supp. 621 (E.D.Va. 1971); Clutchette v. Procunier, 328 F. Supp. 767, 779–784 (N.D.Cal.1971); Bundy v. Cannon, 328 F.Supp. 165, 172–173 (D.Md.1971); Rhem v. Malcolm, 371 F.Supp. 594, (S.D.N.Y.1974).

 Several forms of punishment revealed by the evidence amount to the kind of "grievous loss" referred to in *Morrissey,* including, for example, punitive segregation in the "box" for any period of time; the punitive segregation for twenty-four hours or more of defendants Berch, Gibson and Lucas; Berch's prolonged denial (thirty-three days) of exercise outside his single cell; Berch's prolonged denial (thirty-three days) of normal telephone use; Gibson's prolonged denial (two weeks) of "store box"; Gibson's prolonged denial (two weeks) of normal telephone use; Gibson's prolonged denial (two weeks) of normal visitation privileges; Lucas' prolonged denial (seventy days) of normal visitation privileges; Lucas' prolonged denial (seventy days) of normal telephone use.

## C.

## ACCESS TO COURTS AND MATTERS OF GENERAL CORRESPONDENCE

 Inmates, however, confined, may not be deprived of visits from attorneys, mail from courts and attorneys, telephone calls to attorneys, writing materials or legal papers, as these are the rudiments of the exercise of the constitutional right to petition for redress of grievances. Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Cross v. Powers, 328 F.Supp. 899 (W.D.Wis. 1971); Castor v. Mitchell, 355 F.Supp. 123 (W.D.N.C.1973). Additionally, pretrial detainees may not have their correspondence with friends, relatives or potential witnesses limited for disciplinary reasons, Inmates of Milwaukee County Jail v. Petersen, *supra.* The defendant Stahl's impeding of plaintiff Berch's letters from his wife and of his suit in this court, and his confinement of plaintiff Gibson in punitive segregation because of his suit in this court, are unconstitutional interferences with plaintiffs' right of access to the courts, Smith v. Robbins, 328 F.Supp. 162 (D.Me.1971), aff'd in relevant part, 454 F.2d 696 (1st Cir. 1972); Rhem v. McGrath, 326 F. Supp. 681, 690–691 (S.D.N.Y.1971) and Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I.1970).

The defendants' interference with communication between plaintiff Berch and his wife may also be unconstitutional as an infringement of rights attached to the marital state. The Supreme Court has pointed out that there are "fundamental" rights of "personal privacy" attached "to activities relating to marriage" and to "family relationships." Roe v. Wade, 410 U.S. 113, 152–153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), citing Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and Prince v. Massachu-

setts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944). See also Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). "Regulations limiting [the right of marital privacy] must be narrowly drawn to express only the vital interests at stake." Hess v. Schlesinger, 486 F.2d 1311, 1312 (D.C. Cir. 1973). See also Worley v. Bounds, 355 F.Supp. 115 (W.D.N.C.1973).

Though *Griswold* and *Roe* dealt with physical aspects of the marriage relationship, the emotional side can not be overlooked; there is, still today, a truth in the poet's assertion that "stone walls do not a prison make" so long as the prisoner retains contact with loved ones outside the walls.

██ Totally independent, therefore, of a prisoner's right to communicate with courts is his right to communicate with loved ones, especially his wife. The state can not restrict that right short of the demonstration of a compelling interest—an interest it should hardly be necessary to add—wholly lacking in this case. Indeed, since the hope of rehabilitation depends at least in part on a prisoner's development and maintenance of affirmative social relationships, there would appear to be a significant state interest in favor of encouraging the strengthening of family ties.

### D.

### RACIAL SEGREGATION

██ Testimony also revealed that the jail authorities pursue a policy of racial segregation with regard to sixteen and seventeen-year-old inmates. Such a practice is clearly unconstitutional, Lee v. Washington, 390 U.S. 333, 84 S.Ct. 994, 19 L.Ed.2d 1212 (1968). No order on that subject is made, since the issue of racial segregation is not raised by any of the plaintiffs; however, it will be assumed that such segregation will not continue.

### ORDER AND JUDGMENT

1. The following are declared unconstitutional:

(a) Punitive confinement in the "box" for periods in excess of twenty-four (24) hours.

(b) Punitive confinement in a solid-door single cell for periods in excess of fifteen (15) days.

(c) Punitive confinement in a barred-door single cell for periods in excess of thirty (30 days).

(d) Depriving an inmate of his clothing as a punitive measure.

(e) The failure to give written notice to the inmate for any alleged disciplinary infraction, punishment for which might result in a loss of privileges or reduction in status.

(f) Failure to provide an inmate the opportunity to request and have a prior hearing containing the elements previously outlined in this opinion in all cases where the possible penalty for the offense might involve a grievous loss of privileges and status to the prisoner, including but not limited to any extended denial of store box, exercise outside of single cell, access to reading materials, telephone use, or non-attorney visitation.

(g) Punitive solitary confinement without providing an opportunity to request a prior hearing containing the elements previously outlined in this opinion.

(h) Withholding plaintiffs' writing materials and personal legal papers, thereby restricting access to the courts.

(i) Impeding of plaintiff Berch's letters to and from his wife and of his mail to and from this court.

(j) Placing of one or more plaintiffs in isolation or otherwise punishing them for filing suits against the defendants.

(k) Failure to provide adequate lighting in inmate living quarters.

2. The defendant Stahl is ordered:

(a) To cease the use of the "box" for disciplinary imprisonment for any

period of over twenty-four (24) hours; to cease the punitive use of solid-door single cells for periods of over fifteen (15) days; to cease the punitive use of barred-door single cells for periods of over thirty (30) days; and to cease depriving an inmate of his clothing as a punitive measure.

(b) To provide written notice to an inmate for any alleged disciplinary infraction which might result in a loss of privileges or reduction in status.

(c) To provide an inmate the opportunity to request and have a prior hearing containing the elements previously outlined in this opinion in all cases where the possible penalty for the offense might involve a grievous loss of privileges and status to the prisoner, including but not limited to any extended denial of store box, exercise outside of single cell, access to reading material, telephone use, or non-attorney visitation.

(d) To preserve for at least two years from date of decision all notices, charges, reports, photographs, tape recordings, transcriptions, and evidence and records of any kind used or made or procured, and all findings and conclusions and decisions made in connection with any disciplinary proceedings. No such materials shall be destroyed after any claim is made or suit filed in connection with any such incident.

(e) To cease the ordering of solitary confinement for periods in excess of twenty-four (24) hours as punishment without first affording the prisoner an opportunity to request a hearing, said hearing to contain the elements previously outlined in this opinion.

(f) To cease failing to deliver mail and to cease depriving any inmate of mail, writing materials, or legal papers, or of contact with attorneys.

(g) To cease housing prisoners in cells with inadequate lighting.

3. Defendants will pay the costs.

4. Counsel for plaintiffs are directed to advise the court in writing what plaintiffs, if any, desire a trial on their claims of damages.